863 A.2d 1031

**John Allen RUTHERFORD**

v.

**STATE of Maryland.**

**No. 131, Sept. Term, 2003.**

Court of Special Appeals of Maryland.

Dec. 23, 2004.

Adina N. Smith (Stephen Harris, Public Defender, on brief), for appellant.

Devy Patterson Russell (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Panel SALMON, BARBERA, SHARER, JJ.

BARBERA, J.

Appellant, John Allen Rutherford, was convicted by a jury in the Circuit Court for Harford County of second degree rape, second degree sex offense, two counts of third degree sex offense, and child abuse.[1] He was sentenced to twenty years' imprisonment for rape, with concurrent sentences of twenty years for second degree sex offense and ten years for each third degree sex offense, and a sentence of fifteen years for child abuse, to be served consecutive to the remaining sentences. Appellant asks three questions on appeal, which we have rephrased:

I. Did the trial court err in declining to admit, under the doctrine of verbal completeness, a subsequent extrajudicial statement by appellant after having admitted a prior extrajudicial statement by him?

II. Did the trial court abuse its discretion in declining to grant a mistrial after inadmissible hearsay testimony was admitted?

III. Did the trial court err in not merging the rape and sexual offense convictions into the conviction for child abuse?

For the reasons that follow, we shall affirm the judgments of the circuit court.

## FACTS

In November 2001, appellant lived with his mother in a townhouse at 1432 Harford Square Drive in Harford County,

---

1. The court granted appellant's motion for judgment of acquittal on a second charge of second degree sex offense.

Maryland. During the fall of 2001, Sarah Mae Rutherford, appellant's five-year-old daughter (and the victim in this case), visited appellant at the Harford address on the weekends. Sarah spent the week with her mother, who had been diagnosed with terminal brain cancer, and Sarah's maternal grandmother.

Heather Sullivan lived next door to appellant and his mother. Heather, a high school student, often played with Sarah and thought of her as a little sister.

Heather testified at trial that, in the late afternoon of Saturday, November 17, 2001, Sarah came over to Heather's house to play. As the two were watching a movie, Sarah began to act in an unusual manner. She licked Heather's arms, face, and neck and, at least three times, lifted up Heather's shirt. Sarah did not accede to Heather's requests to stop.

In an attempt to distract Sarah, Heather asked her to "[t]ell me a secret." As Sarah began to talk, she started to cry and shake, and she held onto Heather tightly. Heather called her mother, who was in the kitchen, into the room.

Sarah climbed onto Mrs. Sullivan's lap and talked to her. While Sarah was talking, she continued to cry, shake, and tightly clutch both women.

As a result of what Sarah said to Heather and Mrs. Sullivan, the two women went to the local police station, leaving Sarah at the Sullivan house with Mrs. Sullivan's son and daughter-in-law. At the request of the police, Mrs. Sullivan and Heather each gave a written statement concerning what Sarah had told them. They returned home and drove Sarah, with a police escort, to Upper Chesapeake Hospital.

Sarah was taken into an examination room, where she was met by Linda Holden, a sexual assault and forensic examiner (SAFE) nurse. Ms. Holden testified at trial that she explained to Sarah that she was a nurse and was there to take care of her and make sure she was all right. Ms. Holden asked Sarah if she knew why she was at the hospital, to which

Sarah replied, "I'm here because my daddy touched my private."

Ms. Holden asked Sarah what was her "private" and Sarah pointed to her vaginal area. Ms. Holden asked Sarah if there was any contact with her mouth, and Sarah replied that appellant had "tongue kissed me."

Dr. Carla Janson was accepted at trial as an expert in emergency medicine and trauma. She testified that she met Sarah at the hospital about 2:00 a.m. on November 18th. Sarah told her that her father had touched her privates, that he had put his penis in her vagina, and that he had put his penis in her mouth. Sarah also reported that she had told her father to stop but that he would not. Sarah told Dr. Janson that "it" had last happened around 5:00 p.m. the day before, the day before that, and on prior, unspecified occasions.

Saliva, mouth, and vaginal swabs from Sarah were taken. Dr. Janson testified that when she put "the minutest amount of gentle pressure" on the sides of Sarah's vaginal area, a crack opened in the skin between her vaginal opening and rectum and started to bleed. Dr. Janson also noted that the abraded area on Sarah's labia minora bled a little when touched.

Dr. Janson opined, based on her training and experience, that the injuries were no more than 36 hours old and were consistent with Sarah's explanation. On cross-examination, Dr. Janson added that she had examined hundreds of pediatric vaginal areas for "various things[,] injury, illness, trauma of various sorts, [and] other problems. This is more consistent with [Sarah's explanation] than anything else that I can think of."

Ms. Holden, who had assisted Dr. Janson during Sarah's examination, testified that she noticed that Sarah had vaginal discharge, which is unusual for children. She also noticed that Sarah's external genitalia were red, that there was an abrasion to her left labia minora, and that she had a small tear in the skin between the back of the vagina and the rectum. Ms. Holden said that vaginal penetration could cause the injuries

she saw and that the injuries were consistent with Sarah's explanation.

While Sarah was at the hospital, the police executed a warrant to search appellant's townhouse. The corporal who executed the search warrant noted that there were three bedrooms, which appeared to be used by appellant, his mother, and appellant's fifteen-year-old niece. The corporal saw no bed for Sarah but her clothes were found in all three bedrooms. The corporal also noted that children's toys and videotapes were strewn about appellant's room.

The police seized pillow cases, a sheet, and a quilt from appellant's bedroom. The items were taken to the Maryland State Police Crime Lab for testing.

An expert in the field of forensic serology testified that she found sperm on the vaginal swab of Sarah, a semen stain on the crotch of the underwear Sarah was wearing at the hospital, and semen stains on the quilt.

An expert in forensic DNA analysis testified that the sperm found on the vaginal swab and the semen stain found on Sarah's underwear were insufficient to test chemically. The stains on the quilt, however, were consistent with Sarah's and appellant's DNA. The expert stated that the stain was 2.2 million times more likely to have come from Sarah and appellant than from any other combination of people.

Penny Boccelli, a social worker with Harford County, was also called by the State. She testified that she met Sarah at the hospital, and that Sarah told her that "Daddy had touched her privates, daddy had rubbed her privates, daddy had put his thingie in her mouth, [and] daddy had put his private in her private." Ms. Boccelli said that Sarah reported to her that this had happened that day, yesterday, and the day before yesterday. Sarah explained to her that she had gone into appellant's room in the morning to watch television, and appellant made her lie down on his bed. He then took off her clothes and "rubbed his private on her and put his private in her mouth and in her private." She told him to stop but "daddy wouldn't stop."

After the hospital examination, Sarah was taken into foster care. Ms. Boccelli interviewed Sarah the morning of Monday, November 19. Ms. Boccelli videotaped and audiotaped the interview. Both tapes were played for the jury.

About a week after her interview with Sarah, Ms. Boccelli received a call from Sarah's maternal grandmother, who reported that Sarah was having nightmares. By this time, evidently, Sarah had been removed from foster care and was living with her grandmother.

At some later time, Ms. Boccelli visited Sarah at school. She found Sarah in the nurse's office upset and crying. On this occasion, Sarah told Ms. Boccelli that "daddy didn't do it," and that "three black boys down the street" had done it. When pressed for details, such as the names and appearance of the boys, when the assault occurred, and what precisely they had done to her, Sarah replied that she did not remember.

Ms. Boccelli asked Sarah if she had talked with anyone in her father's family. Sarah replied that she had "snuck" a telephone call to her father, and her father's mother had called her.

On each subsequent occasion on which she had contact with Sarah, Ms. Boccelli asked about the three black boys. Each time, Sarah replied that she did not remember.

Leslie O'Keefe testified that she met appellant on May 22, 2002, while the two were being transported in a van from the Harford County Detention Center to circuit court. During the ride, O'Keefe asked appellant why he was in jail. Appellant responded: "because I supposedly raped my five year old daughter." Appellant explained that "they picked me up because the DNA came back positive[.]" When O'Keefe suggested that appellant must have done something wrong because DNA is 99.9% positive, he responded: "Well, they found it on the blanket that was on my bed and it was probably because I was masturbating while my daughter was in the bed next to me and I pulled her panties down." Upon arrival at

the courthouse, O'Keefe reported to one of the officers what appellant had said.

Appellant's mother, Evelyn Grace, and appellant testified for the defense. Ms. Grace testified that Sarah always slept in Ms. Grace's bed with her and that Sarah had slept with her on Friday, November 16, 2001. Ms. Grace testified that she left for work as an elderly aide the next morning, and next saw Sarah around lunch time. Ms. Grace testified that appellant spent most of the day in bed. Sarah played outside that afternoon and, at one point, Ms. Grace went to look for her but could not find her. On cross-examination, Ms. Grace admitted that she worked on the weekends from 7:00 p.m. to the following morning and would spend the night out of the house on "all weekends."

Appellant testified in his defense. He denied ever touching Sarah. He testified that he slept most of the day on Saturday while Sarah played outside. He admitted that Sarah sometimes slept with him but said that it occurred infrequently, maybe once a month. He explained the semen on the quilt by saying that he had either had a "wet dream" or had masturbated. He denied pulling down Sarah's underwear.

Appellant gave a different version of his conversation with Leslie O'Keefe than she had given. He testified that he had told O'Keefe that he was charged with raping his daughter, that he did not rape his daughter, and that he had been told that the police had found semen stains on a blanket in his bedroom.

## DISCUSSION

### I.

Appellant argues that the trial court erred when it refused to allow him to elicit, under the doctrine of verbal completeness, a second statement he made to Leslie O'Keefe. As we shall explain, the court did not abuse its discretion in refusing appellant's request.

■ The common law doctrine of verbal completeness "allows a party to respond to the admission, by an opponent, of part of a writing or conversation, by admitting the remainder of that writing or conversation." *Conyers v. State*, 345 Md. 525, 541, 693 A.2d 781 (1997), *cert. denied*, 528 U.S. 910, 120 S.Ct. 258, 145 L.Ed.2d 216 (1999). The Court of Appeals explained in *Conyers:*

> This right of the opponent to put in the remainder is universally conceded, for every kind of utterance without distinction; and the only question can be as to the scope and limits of the right.
>
> * * * In the definition of the limits of this right, there may be noted three general corollaries of the principle on which the right rests, namely:
>
> (a) No utterance irrelevant to the issue is receivable;
>
> (b) No more of the remainder of the utterance than concerns the same subject, and is explanatory of the first part, is receivable;
>
> (c) The remainder thus received merely aids in the construction of the utterance as a whole, and is not in itself testimony.

*Id.* at 541–42, 693 A.2d 781 (citations and quotation marks omitted). *See also Churchfield v. State*, 137 Md.App. 668, 691–92, 769 A.2d 313, *cert. denied*, 364 Md. 536, 774 A.2d 409 (2001).

■■ . "The doctrine of verbal completeness does not allow evidence that is otherwise inadmissible as hearsay to become admissible solely because it is derived from a single writing or conversation." *Conyers*, 345 Md. at 545, 693 A.2d 781 (citation omitted). Evidence offered under the doctrine is also subject to Maryland Rule 5–403. The rule provides that evidence, even if relevant, may be excluded if its explanatory value is substantially outweighed by the danger of unfair prejudice. *Churchfield*, 137 Md.App. at 692, 769 A.2d 313.[2]

---

2. The doctrine of verbal completeness is partially codified, at least as to timing, in Maryland Rule 5–106. That rule reads: "When part or all of

In *Conyers,* the trial court allowed a witness to testify about an inculpatory statement Conyers had made to her, but disallowed the introduction of a second statement Conyers had made to the witness on the same subject. The Court of Appeals upheld the trial court's ruling that the second statement did not come within the doctrine of verbal completeness. 345 Md. at 543, 693 A.2d 781.

The *Conyers* Court pointed out, preliminarily: "Neither party has cited, nor have we found, a case in this Court or in the Court of Special Appeals that has, under the doctrine of completeness or Md. Rule 5–106, admitted a writing or statement that was not the remaining part of a single writing or conversation." The Court recognized, however, that, "[i]n an appropriate circumstance, [ ], the doctrine would permit the admission of a *separate writing or conversation* to place in context a previously-admitted writing or conversation." *Id.* at 542, 693 A.2d 781.

The *Conyers* Court cited *State v. Baca,* 120 N.M. 383, 902 P.2d 65 (1995), as an example of an appropriate circumstance for allowance of a second statement to correct what would have been a misleading impression had only the first statement been presented to the jury. The *Conyers* Court concluded that the case before it was unlike *Baca* because, in the latter case, "the jury clearly could have been misled by the first statement if not also allowed to consider the second, and we cannot hold that the trial judge abused his discretion in refusing to admit [Conyers's] second statement concerning the weapons." *Id.* at 544, 693 A.2d 781.

The Court went on to note that, even if the second statement were part of the same conversation in which the first statement had been made, it still would have been inadmissible. This is because, unlike the first statement, which was offered against Conyers and thus came within the hearsay

a writing or recorded statement is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it."

exception for admissions of the party opponent, the second statement was offered in support of Conyers and, as such, was inadmissible hearsay. *Id.* at 544, 693 A.2d 781.

We followed *Conyers* in *Churchfield.* There, we held that the trial court had not abused its discretion by declining to admit, under the doctrine of verbal completeness, a second statement Churchfield had made to a social worker. We so concluded because the statement had come from a conversation separate from that in which the inculpatory statement had come. 137 Md.App. at 693, 769 A.2d 313.

In the present case, a bench conference was held before the State called Leslie O'Keefe to the stand. The State intended to have O'Keefe testify about appellant's statement, made while the two were en route to the courthouse, that the police had found semen stains on his quilt because he had pulled down his daughter's panties while masturbating.

The defense asked to be allowed to question O'Keefe, under the doctrine of verbal completeness, about a statement appellant had made on their return trip from the courthouse to the detention center. The defense proffered that appellant had told O'Keefe, in an effort to explain the injuries to Sarah's genital area, that his mother had reported having seen Sarah putting Barbie dolls into her vaginal area.

The State replied that the doctrine of verbal completeness did not apply to this second statement because appellant had made it in a separate conversation with O'Keefe. Moreover, the statement was inadmissible hearsay.

The trial court agreed with the State and ruled the second statement inadmissible. The court reasoned that the doctrine of verbal completeness did not apply because the statements were made in separate conversations. Moreover, appellant's second statement, concerning how Sarah's genital injuries were caused, did not explain the first statement, concerning why semen was on the quilt. Finally, the second statement was unreliable because appellant had time to reflect between his two statements, and the second statement contained several layers of hearsay.

■ We agree with the trial court's assessment of the issue. The second conversation took place several hours after the first and, as in *Conyers,* appellant's statement during that conversation was not necessary to correct any misleading impression left by the first statement. Indeed, appellant's second statement, which gave an explanation for how Sarah's genital injuries were caused, did not relate in any way to his first statement, in which he discussed why his semen was on the quilt. Moreover, as in *Conyers,* appellant's second statement contained not only his own self-serving (and unreliable) hearsay, but the hearsay statement of his mother. The court did not abuse its discretion in denying appellant's request to elicit the second statement.

## II.

Appellant also argues that the trial court abused its discretion in refusing to grant his request for a mistrial after allegedly damaging and prejudicial hearsay testimony was admitted in error. We perceive no abuse of discretion.

■ The grant or denial of a motion for mistrial is a matter within the discretion of the trial court, and the exercise of that discretion will not be reversed absent an abuse of discretion. *Jenkins v. State,* 375 Md. 284, 295–96, 825 A.2d 1008 (2003). The grant of "[a] mistrial is 'an extreme sanction' that courts generally resort to only when 'no other remedy will suffice to cure the prejudice.'" *Webster v. State,* 151 Md.App. 527, 556, 827 A.2d 910 (2003) (quoting *Burks v. State,* 96 Md.App. 173, 187, 624 A.2d 1257, *cert. denied,* 332 Md. 381, 631 A.2d 451 (1993)). Whether a mistrial is warranted thus hinges upon the extent to which, if at all, the defendant has been unfairly prejudiced. *See Hudson v. State,* 152 Md.App. 488, 521–22, 832 A.2d 834, *cert. denied,* 378 Md. 618, 837 A.2d 928 (2003).

■ The Court of Appeals has identified five factors relevant to the determination of whether a mistrial is required. Those factors include

"whether the reference to [the inadmissible evidence] was repeated or whether it was a single, isolated statement; whether the reference was solicited by counsel, or was an inadvertent and unresponsive statement; whether the witness making the reference is the principal witness upon whom the entire prosecution depends; whether credibility is a crucial issue; [and] whether a great deal of other evidence exists[.]"

*Rainville v. State,* 328 Md. 398, 408, 614 A.2d 949 (1992) (quoting *Guesfeird v. State,* 300 Md. 653, 659, 480 A.2d 800 (1984)).

In the present case, Ms. Boccelli, a social worker for Child Protective Services, testified on direct examination about her contact with Sarah at the emergency room, her interview with Sarah the following day, and a telephone call she received from Sarah's maternal grandmother about a week later, in which the grandmother reported that Sarah was having nightmares. The State then asked Ms. Boccelli whether she was asked, at some later time, to see Sarah at school. Ms. Boccelli responded that she was. The State asked "why" she was called to the school, and the following ensued:

[THE WITNESS]: Well, in the course of an investigation I frequently visit the children throughout my investigation. On this particular day I went to visit Sarah at her elementary school and I visited with her in the nurse's office alone. She was very, very upset and she was crying. She was very—just very, very upset like crying very hard. She told me that she couldn't sleep, she was very upset. I said, Sarah, what is wrong? Sarah told me that daddy didn't do it. So, she started to recant her story. I said, Sarah, what do you mean daddy didn't do it? She was very upset like she was gasping for—like this because she had gotten herself so worked up. She said it was the three bl[a]ck boys. I said, What three black boys, Sarah? She said, It was the three black boys down the street. I said, Do the black boys have names? I don't remember. What do they look like? I don't remember. What did they do, Sarah? I don't remember. When was this? I asked her lots of

questions and she could give me no details. She just kept saying and gasping and crying, It was the black boys, it was the black boys. I asked Sarah if she had talked to anyone from her father's family. She said—

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[THE WITNESS]: She said that her Nanna, which is Mr. Rutherford's mother Evelyn Grace, had called on the phone and that she had snuck a phone call, because Sarah would get up in the middle of the night and sneak to the phone and she had spoke with her father on the phone. Every time I saw Sarah I would say, [S]arah, do you remember about the three black boys? She would say, 1 don't remember. Then in my very last contact with Sarah she said that was a lie, that she didn't want daddy to go to jail.

[DEFENSE COUNSEL]: Objection. Move it be stricken.

THE COURT: Do you want to come up?

At the ensuing bench conference, it became clear to the court that, contrary to its belief, Ms. Boccelli's testimony about her conversation with Sarah at her school had not been ruled admissible at a pre-trial hearing that was held before a different member of the court. Appellant moved for a mistrial stating that the admission of the inadmissible hearsay was not "fixable." The State told the court that it was surprised about Ms. Boccelli's testimony, but argued that the error could be cured by striking the offending testimony and giving a curative instruction to the jury.

The court took a brief recess to review the testimony. Upon reconvening, the trial court stated:

To summarize, I went back and had Mr. Reporter read through again to make sure that my notes or my recollection and notes were accurate, and they were. I just then had counsel come back just to double check with me as to the point where we had left off. I think we had questions, I had sustained the objections that were made down to and through where we had Ms. Boccelli quoting Sarah that daddy didn't do it, that three black boys did, then she didn't

have specifics, and then there was a question as to whether she had talked to anyone from the father's family. [Defense counsel] did object to that and I overruled.

Once again, it was my understanding that a lot of this had been dealt with at a prior hearing. We just double checked the transcript from the hearing in front of Judge Baldwin and it turns out this had not been part of the notice to the defense and had not been part of that earlier proceeding before Judge Baldwin.

So, frankly at this point it looks like that was erroneously allowed in. There was then another question about the last contact that Ms. Boccelli had with Sarah and Sarah said that was a lie and she didn't want daddy to go to jail. That is when I got you all up here, and that also was not covered in front of Judge Baldwin.

So, quite frankly, as far as I'm concerned those last two things should not have come in, they should have been sustained. I don't think the State is arguing otherwise.

Defense counsel renewed his motion for mistrial. Counsel argued that appellant was prejudiced by Ms. Boccelli's testimony concerning Sarah's revelation that she had telephone contact with appellant and his mother, because it suggested that the two of them were trying to manipulate Sarah.

The court denied the motion for mistrial, but instructed the jury:

Ladies and gentlemen of the jury, the Court has stricken the testimony of Ms. Boccelli following her testimony that Sarah had told her that daddy didn't do it, that it was three black boys, but that she didn't remember any other specifics. You are to disregard everything said by this witness after that and give it no consideration whatsoever.

At the end of trial, the trial court further instructed the jury, among other things:

When the Court has sustained an objection to a question, the jury is to disregard the question, and may draw no inference from the wording of it or speculate as to what the witness would have said if permitted to answer. Nor should

you be concerned about the attorneys' approaching the bench or your being returned to the jury room. Such actions are not intended to keep you in ignorance of anything, but were simply matters of having the Court rule on points of law such as the admissibility of evidence. Therefore, whatever you heard was, unless ordered stricken by the Court, legally proper for you to hear so that you can determine the case on proper evidence and not on improper evidence.

■ We assess what occurred in this case by resort to the factors identified in *Rainville*. As we do, we note that the objectionable testimony was not repeated; the reference was not solicited by the State and was unresponsive to the question asked; and Ms. Boccelli was not a principal witness upon which the "entire prosecution" depended, but was, instead, one of a number of State witnesses. And, although appellant's credibility was an important issue, there was much other evidence presented that went to establish appellant's guilt, including DNA evidence, appellant's inculpatory statement to Leslie O'Keefe, testimony of two medical examiners, and Sarah's own interview.

We hold that, under these circumstances, the court did not abuse its discretion in denying the mistrial request.

### III.

The trial court imposed concurrent sentences for the rape and sexual offenses of which appellant was convicted, and a separate, consecutive sentence on his conviction for child abuse. Appellant cries foul, arguing that the court should have merged the rape and sexual offenses into his conviction for child abuse. He cites *Nightingale v. State*, 312 Md. 699, 542 A.2d 373 (1988), in support of his argument. There was no sentencing error.

Article 27, § 35C (1996 Repl.Vol., 2001 Supp.), which was in effect at the time charges were filed, provided in pertinent part:

(b) *Violation constitutes felony; penalty; sentencing.—*
(1) A parent or other person who has permanent or
temporary care or custody or responsibility for the supervi-
sion of a child or a household or family member who causes
abuse to the child is guilty of a felony and on conviction is
subject to imprisonment in the penitentiary for not more
than 15 years.

\* \* \*

(3) *The sentence imposed under this section may be
imposed separate from and consecutive to or concurrent
with a sentence for any offense based upon the act or acts
establishing the abuse.*[3]

(Emphasis added.)

The italicized portion of the statute was enacted in 1990 "for
the express purpose of overruling the holdings in *Nightingale*,
312 Md. 699, 542 A.2d 373 (1988), and in *White v. State*, 318
Md. 740, 569 A.2d 1271 (1990), which had applied the rule of
lenity to multiple sentences in child abuse cases." *Fisher v.
State*, 367 Md. 218, 242, 786 A.2d 706 (2001).[4] Appellant
recognizes this, but nonetheless argues: "However, the Gener-
al Assembly cannot override the Constitutional requirements
of the ban on Double Jeopardy. Section 35C(b)(3) is ineffec-
tive where the rape or sexual offense is a lesser included crime
of the sexual child abuse."

 Appellant fails to support this statement with any
case law, statute, or legislative history, or to provide additional
argument on the subject. "[I]f a point germane to the appeal
is not adequately raised in a party's brief, the [appellate] court
may, and ordinarily should, decline to address it." *DiPino v.
Davis*, 354 Md. 18, 56, 729 A.2d 354 (1999) (citation omitted).

---

**3.** That section has been recodified, effective October 1, 2002, at Crimi-
nal Law Article, § 3–602 (2002).

**4.** In *Fisher*, the trial court had imposed separate sentences on the child
abuse, conspiracy, and murder counts. 367 Md. at 243, 786 A.2d 706.
No challenge was raised on appeal to the imposition of separate
sentences.

■■■ We address the issue nonetheless to clarify that appellant's argument fails in light of the United States Supreme Court's decisions of *Albernaz v. United States*, 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981), and *Missouri v. Hunter*, 459 U.S. 359, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983). The Court made plain in *Albernaz* that the test announced in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), for determining whether separate sanctions may be imposed for multiple offenses arising out of a single transaction "is a 'rule of statutory construction,' and because it serves as a means of discerning congressional purpose the rule should not be controlling where, for example, there is a clear indication of contrary legislative intent." 450 U.S. at 340, 101 S.Ct. 1137.

And, with regard to the double jeopardy concern based on the imposition of multiple punishment for offenses arising out of the same transaction, the *Albernaz* Court had this to say:

Last Term in *Whalen v. United States*, [445 U.S. 684, 688, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980)], this Court stated that "the question whether punishments imposed by a court after a defendant's conviction upon criminal charges are unconstitutionally multiple cannot be resolved without determining what punishments the Legislative Branch has authorized." In determining the permissibility of the imposition of cumulative punishment for the crime of rape and the crime of unintentional killing in the course of rape, the Court recognized that the "dispositive question" was whether Congress intended to authorize separate punishments for the two crimes. This is so because the "power to define criminal offenses and to prescribe punishments to be imposed upon those found guilty of them, resides wholly with the Congress." As we previously noted in *Brown v. Ohio*, [432 U.S. 161, 165, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977)], "[w]here consecutive sentences are imposed at a single criminal trial, the role of the constitutional guarantee is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense." Thus, the question of what punish-

ments are constitutionally permissible is not different from the question of what punishments the Legislative Branch intended to be imposed. Where Congress intended, as it did here, to impose multiple punishments, imposition of such sentences does not violate the Constitution.

*Id.* at 344, 101 S.Ct. 1137 (some internal citations omitted).

Then, in *Hunter*, the Supreme Court applied this reasoning to the Missouri legislature's scheme to punish separately both the use of a dangerous or deadly weapon in the commission of a felony and the felony itself. The *Hunter* Court repeated the notion that "simply because two criminal statutes may be construed to proscribe the same conduct under the *Blockburger* test does not mean that the Double Jeopardy Clause precludes the imposition, in a single trial, of cumulative punishments pursuant to those statutes." 459 U.S. at 368–69, 103 S.Ct. 673. The Court went on to say that "[w]here, as here, a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the 'same' conduct under *Blockburger,* a court's task of statutory construction is at an end and . . . the trial court . . . may impose cumulative punishment under such statutes in a single trial." *Id.; see also State v. Lancaster,* 332 Md. 385, 394, 631 A.2d 453 (1993) (stating that when the General Assembly makes expressly clear its intent to allow separate punishments for multiple offenses that are the "same" under the required evidence test, cumulative sentences may be imposed).

*Albernaz and Hunter* control this case. As we have said, the General Assembly has expressly authorized multiple punishments for child abuse and any underlying sexual offenses. There is, then, no double jeopardy bar to the sentences imposed in this case.

**JUDGMENTS AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**