REPORTED

IN THE COURT OF SPECIAL APPEALS
OF MARYLAND

No. 1782

September Term, 2012

FRANK THEODORE WILLIAMS

v.

STATE OF MARYLAND

Zarnoch,
Graeff,
Moylan, Charles E., Jr.
 (Retired, Specially Assigned),

JJ.

Opinion by Moylan, J.

Filed: February 26, 2014

The appellant, Frank Theodore Williams, was convicted in the Circuit Court for Baltimore County by a jury, presided over by Judge Robert E. Cahill, Jr., of premeditated murder in the first degree, conspiracy to commit first-degree murder, and the use of a handgun in the commission of a crime of violence. On this appeal he raises the four contentions,

    1.     that Judge Cahill erroneously denied his pretrial motion to suppress physical evidence obtained from an examination of his cellphone;

    2.     that Judge Cahill erroneously failed to suppress a statement he gave to the police;

    3.     that Judge Cahill abused his discretion in permitting police officers to narrate what they saw on surveillance videos; and

    4.     that Judge Cahill abused his discretion in denying his motion for a mistrial made during the State's rebuttal argument.

## A Gang-Related Public Execution

The appellant does not challenge the legal sufficiency of the evidence to prove his guilt. The four contentions he does make could readily be resolved in an evidentiary vacuum. Some factual context may nonetheless help to convey the outrageous character of a retaliatory execution perpetrated in the parking garage of the Towson Town Mall during the busy pre-Christmas season.

Rodney Pridget, the 19-year-old murder victim, would have appeared to be an ordinary Christmas shopper, as he spent the afternoon of December 19, 2011, at the Towson Town Mall with his 17-year-old girlfriend, Nautica Reynolds. They arrived by bus, entered the mall through Macy's, and then spent time at the Build-a-Bear store and the Downtown

Locker Room. The twosome took a brief break at the Food Court and then went downstairs to Hollister. Their final shopping destination was Nordstrom's. Little did they realize that throughout the afternoon their locations in the mall had been observed by no less than five persons stalking their every move who were in immediate cellphone communication with each other.

Something, however, did catch Pridget's eye. As he and Nautica left the second floor of Nordstrom's for the connecting parking garage at 6:30 p.m., he told Nautica that he did not like the looks of "the nigger behind me." In the garage, he handed all of the shopping bags to her and told her to walk close to the wall. Suddenly a gunshot rang out. When Nautica looked up, she saw Pridget lying on the ground and heard a volley of gunshots. She described the shooter, tall and wearing a mask, who then ran deeper into the garage. A woman nearby called the police, who arrived a short time later. The autopsy revealed that Rodney Pridget died of eight gunshot wounds, one to the head, one to the chest, three in the back, one to the right side of his body, one to the right arm, and one to the left arm.

Baltimore County Police Officer Kurt Parker was among the first officers to respond. His immediate assignment was to secure the perimeter of the mall parking garage between Joppa Road and the actual mall at the rear of 204 East Joppa Road. He first encountered Officer Daniel Burns, who pointed out an individual, later identified as the appellant, who was frantically running up and down steps in the parking garage, was wearing a gray and black hoodie with a black hat, and was talking into his cellphone as he ran.

With weapon drawn, Officer Parker caught up with the appellant and ordered him to lie prone on the ground. The officer conducted a quick frisk of the appellant and noticed that he was sweaty and hot to the touch. The appellant still held his cellphone in his hand and Officer Parker seized it. The appellant was placed in handcuffs. Within a minute or two, Officer Brian Jednorski arrived on the scene as backup for Officer Parker. A witness then was brought to where the appellant was being held for an attempted identification. When the results of that attempt were negative, the appellant's handcuffs were promptly removed. The officer still wanted to talk to him, however, and Officer Jednorski transported him to the station house. At the station house, Officer Jednorski turned the appellant over to detectives but he himself kept possession of the appellant's cellphone.

The initially murky picture only became clear when Jermell Brandon, who had been arrested the day after the murder and charged with the murder, was persuaded to cooperate with the prosecution. He agreed to enter a guilty plea in federal court and to accept a sentence of 20 years without possibility of parole. In exchange, he testified as a State's witness against the other conspirators. Brandon knew the appellant, William Ward, and Tyrone Brown as members of the Black Guerilla Family ("B.G.F."), although Brandon denied being a member of the B.G.F. himself. That may have been self-serving. He did know that in order to obtain rank in the B.G.F., one had to have killed someone. He testified that Tyrone Brown was just a member of the B.G.F., but that William Ward held the rank of Bushman and that the appellant was a Commander.

Brandon was also aware that earlier in the month of December there had been a shooting of one Dustin Smith by the ultimate murder victim, Rodney Pridget. Dustin Smith was the cousin of the appellant. Brandon was later present with the appellant, William Ward, and Tyrone Brown, as they all joined together to discuss the shooting of Dustin Smith and to decide what to do about it. The appellant went on Facebook and showed all of the others a photograph of their target, Rodney Pridget. They then debated who was going to draw the assignment of killing Pridget. It was the appellant who gave the order of retaliation on Pridget. Brandon agreed to participate.

Brandon went on to describe how on December 19, 2011, he, William Ward, Tyrone Brown, and the appellant, along with several companions, showed up at the Towson Town Mall in several cars and how they located and kept track of Rodney Pridget. As Pridget was leaving Nordstrom's to enter the parking garage, it was William Ward and Tyrone Brown who followed him to do the actual shooting. When they came back into Nordstrom's several minutes later, Brandon asked what had happened and William Ward reported, "We tore his ass up." Brandon and Ward let Brown leave first and then they left. It was Tyrone Brown who had originally arrived at the mall with the appellant and who was assigned to drive the appellant away. Frantic messages then started coming in that the appellant could not find the burgundy Lexus in which he was supposed to leave with Tyrone Brown. They all waited a short time but when the appellant still could not find the getaway car, William Ward, by cellphone, ordered Tyrone Brown to leave without the appellant.

Detective Chris Hodnicki testified as an expert on the discipline and the behavior of street gangs. He authenticated that the appellant, William Ward, and Tyrone Brown were all members of the Black Guerilla Family. He testified that Rodney Pridget was shot in the face in retaliation for the shooting of Dustin Smith. The appellant does not now challenge any of this evidence. His challenges are purely procedural and peripheral.

**Telephone Records and Independent Source**

He first challenges the warrantless seizure of his cellphone. Whether the appellant was literally and formally under arrest when the police subjected him to a hard "take down" in the parking garage is highly problematic. The short-term restraints were as severe as any self-respecting arrest might wish to boast. The longer-term status, on the other hand, trailed off into elusive uncertainty. The reality, of course, is that when the police are still in a combat mode, they are in no position to think in legalistic terms. They react by instinct. As Officer Parker ran through the parking garage, adrenaline pumping and weapon in hand, the last thing on his mind was the paradigm of a good search incident to lawful arrest. When the smoke clears, lawyers construct the theory of the case after the fact, a theory that seldom plays out so neatly on the ground.

Was the appellant arrested? To be handcuffed while lying prone on the ground was, to be sure, a step in that direction. To have a witness at a one-on-one show-up say, "That's not the shooter," and then to be un-handcuffed was decidedly a step in the opposite direction. It was but a short step in the opposite direction, however, as he was, with no say

in the matter, transported to the police station in a squad car. In the midst of chaos, clarity is seldom realistically attainable. At least a fictive clarity is imperative, however, if something was seized in the din of chaos but the reasonableness of that seizure depends upon whether or not it was incident to a lawful arrest.

It is clear that the appellant was un-arrested as of the time Detective Lambert finished his "interview" ("interrogation"?) of the appellant at shortly after midnight and graciously had the appellant transported to any destination of his choice. What is not at all clear is whether the appellant had been continuously un-arrested from his initial detention at 6:30 p.m. throughout the evening or whether, at some later magical moment, he crossed the critical meridian between arrest and non-arrest. The State is understandably in a bit of a quandary on this issue, because while arrest status would work to its advantage on the search incident to arrest issue, it would work to its disadvantage on the Miranda custody issue. On that issue, the State argues fervently that the appellant's conversation with Detective Lambert was nothing more than a voluntary and non-custodial "interview." It is hard to have it both ways, but, of course, the appellant is impaled on the horns of the same dilemma, except facing in the opposite direction.

The appellant contends that his cellphone was unconstitutionally seized and that whatever was learned by the police in the course of examining it, along with the more derivative evidence to which it led, should have been suppressed. The State responds by opening the Fourth Amendment cornucopia of search incident to lawful arrest, consent, and

the plain view doctrine. The only one of those stabs at reasonableness that deserves further comment is search incident to lawful arrest.

A lawful arrest requires more than significant and sustained physical restraint. It even requires more than probable cause to make a warrantless arrest. Even with unassailable probable cause to make an arrest, an officer is still required to go forward and actually to make the arrest.[1] Even with all other factors satisfied, the officer must actually intend to make an arrest. He must, moreover, somehow communicate to the arrestee that he is being arrested. The State makes no mention of these requirements but simply makes a leap of faith to its desired landing place of a lawful arrest.

Even if, purely arguendo, one would agree with the State that the appellant was under lawful arrest when the police handcuffed him and took his cellphone, where does the State go from there? Contrary to what the appellant argues, we agree with the State that a cellphone may be seized and searched (examined) as a valid search incident to lawful arrest. This Court recently made that clear in Sinclair v. State, 214 Md. App. 309, 76 A.3d 442 (2013).[2] The right to search a cellphone as an incident of a lawful arrest does not confer a

---

[1]In the words of T.S. Eliot, "Between the resolution and the act falls the shadow."

[2]Although the viability of Sinclair v. State will have no bearing on our decision in this case, we do note that the Court of Appeals did, on November 22, 2013, grant certiorari in two cases involving the same issue dealt with in Sinclair. In Demby v. State, cert. granted, 435 Md. 501, 79 A.3d 947, the issues for consideration are:

1)  Were Appellant's Fourth Amendment rights violated when an officer, pursuant to a valid arrest, read text messages to and from others located on his

(continued...)

right to search the cellphone of a person who is no longer under arrest. The twin exigencies that justify a warrantless search incident to arrest no longer abide.

If the thing seized as an incident of an arrest turns out to be an instrumentality of crime (a weapon), a fruit of crime (stolen goods), contraband, or other evidence, it may be retained even after the arrest to which its search and seizure were incident has itself come to an end. If none of those categories is satisfied before the arrest is terminated, however, there is no longer a justification for retaining the property of the former arrestee. The property should be returned and is not vulnerable to further examination. At that point, what warrant would the State have to continue to hold and to examine a defendant's property?

The State's position is that once the witness failed to identify the appellant at the one-on-one show-up and the appellant was un-handcuffed, the appellant's status reverted from one of arrest to one of non-arrest. If that was so, the lawful arrest and its generating power

---

[2](...continued)
cell phone without a warrant? 2) Are the independent source or inevitable discovery doctrines applicable where an officer, using information found by warrantlessly searching an individual's cell phone, later obtains a search warrant for that cell phone's contents?

In Spence v. State, cert. granted, 435 Md. 501, 79 A.3d 947, the issue for consideration that is pertinent here is:

May a police officer search the contents of an arrestee's cell phone as a search incident to arrest without a warrant?

We also note that, on January 17, 2014, the Supreme Court granted certiorari in two cases presenting similar issues, California v. Riley, No. 13-132, and United States v. Wurie, No. 13-212.

for producing attendant incidents were thus at an end.  It was only then that the appellant's cellphone was handed by Officer Parker, who had seized it, to Officer Jednorski, who then retained it.  It was only later that evening, when Officer Jednorski was in the screening room to observe the appellant's interview with Detective Lambert, that Officer Jednorski looked down at the cellphone whenever it would ring and then jotted down the numbers from which the calls had been placed.  This was hours after, according to the State's thesis, the arrest had come to an end.  The State points to no legal authority justifying such a belated examination of property as a continuing incident of an earlier but now terminated lawful arrest.  The State's theory of the case has obvious problems.

Fortunately, there come riding into this Stygian uncertainty <u>Murray v. United States</u>, 487 U.S. 533, 108 S. Ct. 2529, 101 L. Ed. 2d 472 (1988), and <u>Segura v. United States</u>, 468 U.S. 796, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984), and the problem-solving clarity of independent source.  In <u>Murray</u>, 487 U.S. at 537, Justice Scalia fully described the independent source doctrine:

> <u>Almost simultaneously with our development of the exclusionary rule, in the first quarter of this century, we also announced what has come to be known as the "independent source" doctrine.</u>  See <u>Silverthorne Lumber Co. v. United States</u>, 251 U.S. 385, 392, 40 S. Ct. 182, 183, 64 L. Ed. 319 (1920). That doctrine, which has been applied to evidence acquired not only through Fourth Amendment violations but also through Fifth and Sixth Amendment violations, has recently been described as follows:
>
> > "[T]he interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by <u>putting the police in the same, not a worse, position that they would have been in</u>

> if no police error or misconduct had occurred.... When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation." Nix v. Williams, 467 U.S. 431, 443, 104 S. Ct. 2501, 2509, 81 L. Ed. 2d 377 (1984).

> The dispute here is over the scope of this doctrine. Petitioners contend that it applies only to evidence obtained for the first time during an independent lawful search. The Government argues that it applies also to evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the initial illegality. We think the Government's view has better support in both precedent and policy.

(Emphasis supplied). And see Segura v. United States, supra.

The concept was first sounded by Justice Holmes as far back as Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S. Ct. 182, 64 L. Ed. 319 (1920):

> Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others[.]

Even were we to assume, arguendo, that the police unreasonably obtained information as to the identities of the cellphones making incoming calls to the appellant's cellphone while it was being retained in police custody, that would not compel the suppression of the mass of information about cellphones independently obtained by the police from the telephone company. In Kamara v. State, 205 Md. App. 607, 623, 45 A.3d 948 (2012), Judge Graeff pointed out, quoting from Cox v. State, 421 Md. 630, 652, 28 A.3d 687 (2011), one of the ways in which even allegedly tainted information may be purged of taint:

There are three circumstances, however, in which evidence obtained after initial unlawful conduct can be purged of taint:

> "... Second, the taint will be purged upon a showing that the evidence was derived from an independent source. ..."

In Williams v. State, 372 Md. 386, 410-11, 813 A.2d 231 (2002), the Court of Appeals similarly explained:

> The independent source doctrine ... applies when the evidence actually has been discovered by lawful means. Its focus is on what actually happened – was the discovery tainted by the illegal search? ... [U]nder the independent source doctrine, evidence that was in fact discovered lawfully, and not as a direct or indirect result of illegal activity, is admissible.

The information that the appellant argues should have been suppressed falls into two categories. The first is the phone number of the appellant's cellphone itself. By itself, it has no inculpatory significance. Derivatively, however, it could have facilitated the police request to the telephone company for the company's records of the appellant's cellphone use. When the appellant first sat down for his interview with Detective Lambert, however, the appellant freely provided his cellphone number on the personal information sheet he filled out. When the police subsequently asked the phone company for the appellant's cellphone records, even assuming they needed his cellphone number to make the initial request, they had it from the independent source as well as from looking at the cellphone itself. This is a classic application of the independent source principle.

The second category of evidence the appellant wanted suppressed consisted of the cellphone numbers, and the identity of the owners of the cellphones, who had called the

appellant or whom the appellant had called during the critical late afternoon hours on December 19, 2011. During the late evening of December 19, Officer Jednorski had jotted down the numbers of those calling the appellant. The telephone company, on the other hand, had those numbers and others independently in its own recorded database. As part of the ongoing investigation of this case, Detective Lambert obtained a judicially issued court order for the phone company to produce the company's records of calls to and from the appellant's cellphone. The phone company complied with that order and produced the requested records. At trial, Detective Lambert and Detective Chuck Gruss provided the jury with detailed descriptions of the cellphone records not only of the appellant but also of Jermell Brandon, William Ward, Crystal Harris, and Marilyn "Baby Sis" Hollemand, all of whom were in regular contact with each other before, during, and after the shooting of Rodney Pridget. This detailed analysis was based on the telephone company records, not on the observations of Officer Jednorski. The source of the information was an independent source not subject to Fourth Amendment exclusion. Thus, the independent source alternative route takes us safely around the search incident quagmire.[3] Evidence of the various phone calls was properly not suppressed.

---

[3]Even were the evidence in question not the product of an independent source, it was derivative evidence sufficiently attenuated so as not to be subject to the Exclusionary Rule. United States v. Ceccolini, 435 U.S. 268, 98 S. Ct. 1054, 55 L. Ed. 2d 268 (1978).

## A Statement That Said Nothing

The appellant's second contention is that he was in custody when interviewed by Detective Jim Lambert at police headquarters at approximately 11 p.m. on the evening of the shooting but that he had not been Mirandized. He moved, therefore, to have everything he said to Detective Lambert suppressed. As intellectually fascinating as it might be, we are not going to entangle ourselves in the web of counteracting factors that determine Miranda custody. We are not going to entangle ourselves because it would be pointless.

In the course of the interview, after which the appellant left the police station on his own accord and un-arrested, the appellant said nothing of inculpatory significance. He consistently denied having had anything to do with the shooting. The only thing the appellant said that had pertinence was his acknowledgment that he had been in the parking garage of the Towson Town Mall at approximately the time that the shooting took place. That, however, was an acknowledgment of the self-evident. Of course the appellant admitted being there. That is where he was spotted by the police, running up and down the stairs of the parking garage. That is where he was forcibly detained by them within close proximity to where the shooting had taken place and within minutes after it took place. The appellant's acknowledgment of his presence was superfluous; three separate police officers testified to it.

The acknowledgment of his presence at the mall, to be sure, included the fact that he had gone to the mall with his cousins, Tony and Tyrone Brown, and that he had gone there

to pick up Crystal Harris, who was at the mall with Jermell Brandon. Marilyn "Baby Sis" Hollomend, however, independently testified directly to that fact. She, working as a "hack" to drive people to places for hire, had delivered Crystal Harris and Jermell Brandon to the mall about two and one-half hours before the shooting. She herself remained at the mall and observed the appellant meet with the two of them at the food court. She later observed the appellant and Crystal Harris walking out of the mall together.

Jermell Brandon, a co-conspirator with the appellant and a former co-defendant, was the key State's witness who revealed the entire murder for vengeance plot. He not only detailed the role that the appellant played as a Commander of the Black Guerilla Family and as the one who ordered the execution of Rodney Pridget, but he described in full detail the appellant's presence at the mall before and at the time of the murder. Brandon testified to having hired "Baby Sis," for $30, to drive him and Crystal Harris to the mall. At one point, while at the mall, they spotted Rodney Pridget in the Downtown Locker Room. Brandon immediately called the appellant on his cellphone to notify him of the spotting. After several of the co-conspirators were arranging the rendezvous with each other, Crystal Harris spotted Rodney Pridget in the Nordstrom end of the mall. At that point, Brandon, the appellant, and William Ward went into Nordstrom's to look for Rodney Pridget. When they spotted him, the appellant walked off to make a cellphone call to Tyrone Brown. When the group, including the appellant, saw Rodney Pridget getting ready to leave the mall, they waited for him to get a little distance in front of them. As Tyrone Brown started to follow Rodney

Pridget, Brandon admonished him not to do anything under the cameras: "You don't wanna be made." It was Tyrone Brown and William Ward who were dispatched to carry out the execution. The appellant moved to get out of the area. Jermell Brandon waited in Nordstrom's to get the report from Brown and Ward. When Ward came back inside Nordstrom's, Brandon asked him what had happened. Ward reported that he "tore his ass up." At just about that time, the appellant was desperately calling to state that he could not find the car in which he and Tyrone Brown were supposed to leave the mall.

Throughout all of this, 268 surveillance cameras were grinding away non-stop. Dozens of snippets of surveillance tapes were shown to the jury, narrated and interpreted by Detective Alvin Barton, who assisted the jury by providing a precise location within the mall and the timing of the taping for each snippet. A snippet from 5:56 p.m. showed a burgundy Lexus arriving at the B garage. The appellant exited the driver's side of the vehicle, went to the trunk, and put on a large jacket. Tyrone Brown also got out of the vehicle. The appellant and William Ward then entered the Macy's side of the larger complex.

A snippet from 6:00 p.m. showed the appellant and William Ward entering the center of the mall toward Nordstrom's. At that point, the two of them were with Jermell Brandon and "Baby Sis." Brandon, William Ward, and the appellant were subsequently taped walking side by side on the third floor of the mall. While the three men were walking, the appellant handed his cellphone to William Ward and Ward was seen holding his hand up to his ear. The three of them then went to the second floor of Nordstrom's. At 6:08 p.m.,

Tyrone Brown exited the Lexus in the parking garage and walked in the same direction that the appellant and William Ward had earlier taken.

A 6:14 p.m. snippet showed the appellant leaving Ward and Brandon and going to the ground level of the mall leading to the parking garages. A tape then showed, on the second floor of Nordstrom's, Rodney Pridget and his companion Nautica walking by; then Ward and Brandon walking by; and finally Tyrone Brown walking by. Rodney Pridget and Nautica then exited Nordstrom's toward the parking garage. Ward, Brandon, and Tyrone Brown then followed in the same direction. Brandon and Ward then came right back in, and Tyrone Brown ran back in moments later. All three men then walked together out of the second floor of Nordstrom's. Tyrone Brown ultimately left the mall through Macy's and returned to the burgundy car where he got in the front passenger seat. Ward and Brandon met up with "Baby Sis" and went to the C garage.

Another snippet showed the appellant re-entering the mall and meeting up with Crystal Harris. The two of them then exited the mall in the same place where Ward and Brandon had done so. The appellant kept walking and went to the garage stairs. That was the place at which the appellant was spotted and detained, going up and down those stairs, by the police a few minutes later.

This tidal wave of testimony and surveillance tape makes the appellant's acknowledgment that he was at the mall and in contact with some of the other actors transparently superfluous. Even if we assume, arguendo, that the appellant was in custody

- 16 -

and non-<u>Mirandized</u> when he was interviewed by Detective Lambert, we are persuaded beyond a reasonable doubt that his innocuous acknowledgment of presence at the mall had no remote influence on the jury's verdict of guilt.  <u>Dorsey v. State</u>, 276 Md. 638, 659, 350 A.2d 665 (1976); <u>Ware v. State</u>, 360 Md. 650, 679-80, 759 A.2d 764 (2000).

We are left to wonder why the appellant even wanted to have this issue litigated.  By the same token, we are left to wonder why the State even bothered to throw in something that added nothing to its case but that ran the risk of sending the court running down all sorts of immaterial tangents.  Such, however, are the musings of hindsight.

**Explaining the Surveillance Tapes**

As we have mentioned, vast areas of the Towson Mall are monitored by 268 surveillance cameras.  In investigating the Rodney Pridget shooting, Detective Alvin Barton, over a period of weeks, examined this immense body of surveillance footage and culled out from the totality those scenes that showed any of the conspirators or other members of the entourage that came with the conspirators to the mall on the late afternoon of the shooting. Through Detective Barton, the final collection of video clips that he compiled were entered in evidence without objection.

During the lengthy playing of the video clips for the jury, Detective Barton was permitted to explain, clip by clip, what area of the mall was being shown in each clip, the time when the action being filmed took place, and the persons of interest being shown in that

particular clip. The appellant now contends that Judge Cahill erroneously permitted Detective Barton to supplement the clips themselves with this narrative explanation of them.

The short answer to his contention is that it has not been preserved for appellate review. When the State initially requested the permission of the court to have Detective Barton provide these narrative explanations of the lengthy surveillance compilation, counsel for the appellant's co-defendant, William Ward, noted an objection. The appellant did not. When Judge Cahill overruled Ward's objection, Ward requested and received a continuing objection. See Maryland Rule 4-323(b). The appellant never requested and never received a continuing objection. For the next 79 pages in the transcript, Detective Barton proceeded to offer his narrative explanations of the surveillance tapes. The appellant sat silent throughout the playing of the video clips with the accompanying explanations.

It was only when Detective Barton had concluded his testimony that Ward's counsel renewed his objection to the narrative explanations and moved to strike the detective's testimony. Judge Cahill ruled:

> Understood. The objection is overruled. There is nothing that I saw during the course of the videos that would cause me to change my mind about the prior ruling. So I understand your objection. It's been adequately preserved in my judgment, but I shall respectfully deny it.

It was only at that point that counsel for the appellant spoke up for the first time.

> Your Honor, for the record on behalf of Mr. Williams [the appellant] we would join in that.

Under Maryland law, in cases involving multiple defendants each defendant must lodge his own objection in order to preserve it for appellate review and may not rely, for preservation purposes, on the mere fact that a co-defendant objected. One defendant, of course, may expressly join in an objection made by a co-defendant but he must expressly do so. It is not implicit. See Morris v. State, 153 Md. App. 480, 496-97, 837 A.2d 248 (2003), cert. denied, 380 Md. 618, 846 A.2d 402 (2004); Hensen v. State, 133 Md. App. 156, 165, 754 A.2d 1055, cert. denied, 360 Md. 486, 759 A.2d 231 (2000).

The appellant's eleventh-hour piggybacking on Ward's renewal of his earlier objection does not, for the appellant, relate back to that earlier objection. Maryland Rule 4-323(a) expressly provides:

> An objection to the admission of evidence shall be made at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent. Otherwise, the objection is waived.

See also Klauenberg v. State, 355 Md. 528, 545, 735 A.2d 1061 (1999) ("[I]t is fundamental that a party opposing the admission of evidence must object at the time that evidence is offered.").

To appreciate how pitifully untimely the appellant's belated objection was, it is helpful to hypothesize his case being tried without a co-defendant. Had a solitary defendant sat silent throughout Detective Barton's lengthy testimony and first objected only after the detective's testimony was over and done, the inadequacy of the objection would be transparent. It is equally inadequate in this case, even if not quite so transparently so.

# The Zeal of Jury Argument

In both opening statement and closing jury argument, the defense suggested a counter-narrative. Its core problem, of course, was to get the jury to discredit the testimony of the fellow conspirator turned State's witness, Jermell Brandon. The strongly intimated counter-argument was that Brandon was the mastermind behind the entire assassination plot. In the opening statement for the defense, that leitmotif was unmistakably sounded:

> This case is about Jermell Brandon. Jermell Brandon is a mid level marijuana dealer down in the Waverly neighborhood of Baltimore City. Jermell Brandon has people that work for him that sell marijuana in Baltimore City, street level distribution. One of Jermell Brandon's street dealers is a man named Dustin Smith.

That statement gave Jermell Brandon the motive for wanting to have Rodney Pridget killed. The State's theory of the case was that the Black Guerilla Family wanted Rodney Pridget killed in retaliation for Pridget's shooting of Dustin Smith a short time earlier. The statement that Brandon was a middle level drug distributor and that Dustin Smith worked for him as a street dealer gave Brandon a personal motive for wanting to have Pridget killed. Notwithstanding the defense opening statement, the trial did not produce evidence that Brandon, Pridget, or the late Dustin Smith were drug dealers or that Smith worked for Brandon.

The defense continued to develop, in its closing argument to the jury, its counter-narrative that Jermell Brandon was the mastermind behind the killing:

> In the opening, [the prosecutor] told you, the only thing that these guys did not take into consideration is two hundred and sixty-eight cameras in the Towson

Mall. ... What was Tyrone Brown – what is Tyrone Brown told by Jermell Brandon? According to Jermell Brandon's own testimony, don't do this under the cameras. You don't' wanna be made. Jermell Brandon took the cameras into consideration.

In rebuttal argument, the State naturally responded.

They said to you in opening that Brandon's a drug dealer and Smith was his seller and it was Brandon. Well, ladies and gentlemen, Kool-Aid. Any evidence? None, zero. They claim Pridget's a drug dealer, that they want you to – they want you to not care that he's dead. What evidence do you have? He's in Build-A-Bear and makes a purchase. Nautica tells you they split it. He uses a gift card at Nordstrom's. And when that young man is murdered, he's got twenty-five dollars in his pocket. Brandon saw him spending money, so it was gonna be a hit. No evidence. That's the problem. Ladies and gentlemen, that is the fundamental problem.

(Emphasis supplied).

The defense objected and, at a bench conference, moved for a mistrial on the ground that the State was attempting to shift the burden of proof to the appellant.

> [APPELLANT'S COUNSEL]: The State's rebuttal at this point is nothing but burden shifting. As your honor knows – as instructed the jury there's no burden on the defense to prove anything. And yet [the prosecutor] is commenting on the State's burden – or the Defense's burden to produce evidence. It's clearly grounds for a mistrial, caused by the State.

At first blush, the State's argument strikes us as fair comment on what the defense had argued. The actual evidence in the case did not support many of the statements the defense made or the counter-narrative that the defense was suggesting. The State was fully entitled to point that out. This was no shifting of the burden of proof. Nor did it suggest that there was a burden on the appellant to prove his innocence.

With commendable patience and with commendable caution, however, Judge Cahill

proceeded to repeat his earlier instruction and to make the allocation of the burden of proof

absolutely clear:

> JUDGE CAHILL: I am going to re-instruct the jury concerning the constitutional right that each Defendant has not to testify because I think one comment was problematic. <u>I think I can cure that adequately with re-instructing the jury on the constitutional right that each Defendant has not to testify in his own defense.</u> The bal – as to the balance of any objection, at this point in time, it's overruled. I ... shall decline to declare a mistrial at this time.

(Emphasis supplied).

> He then proceeded to re-instruct the jury:

> JUDGE CAHILL: Thank you, Ms. [Prosecutor]. Ladies and gentlemen, ... I'll reissue one of the instructions that I gave previously. And that is the following. That the Defendant has an – <u>each Defendant has an absolute constitutional right not to testify in this case. The fact that the Defendant did not testify must not be held against the Defendant and must not be considered by you in any way or even discussed by you during the course of deliberations.</u>

(Emphasis supplied).

Even if, <u>arguendo</u>, the State stepped tentatively on the off-side chalk line, we are

satisfied that Judge Cahill's re-instruction adequately erased any possible misconception the

jury might have had. In any event, this sort of thing is palpably not even in mistrial territory.

If the State, in its ardor, makes a passing misstatement, by all means, correct it. One does

not, however, abort a five-day jury trial involving dozens of witnesses over something so

relatively slight. This was, at its worst, a passing procedural glitch and not a recurring or

- 22 -

dominant theme.  In <u>Rutherford v. State</u>, 160 Md. App. 311, 323, 863 A.2d 1031 (2004),

Judge (now Chief Judge of the Court of Appeals) Barbera wrote for this Court:

> The grant or denial of a motion for mistrial is <u>a matter within the discretion of the trial court</u>, and <u>the exercise of that discretion will not be reversed absent an abuse of discretion.</u>  <u>The grant of "[a] mistrial is 'an extreme sanction'</u> that courts generally resort to only when 'no other remedy will suffice to cure the prejudice.'"  Whether a mistrial is warranted thus hinges upon the extent to which, if at all, the defendant has been unfairly prejudiced.

(Emphasis supplied).  See also <u>Webster v. State</u>, 151 Md. App. 527, 556-57, 827 A.2d 910

(2003).

In <u>Burks v. State</u>, 96 Md. App. 173, 187, 624 A.2d 1257, <u>cert. denied</u>, 332 Md. 381,

631 A.2d 451 (1993), this Court tried to put the extreme sanction of a mistrial in realistic

perspective:

> As we approach our analysis of this contention, we point out that the focus is not on whether the prosecutor was guilty of an impropriety or even whether the prosecutor was guilty of a deliberate and flagrant impropriety, but only on what the appropriate sanction should be.  The judge agreed with the appellant that an impropriety had indeed occurred and promptly gave a curative instruction.  <u>She did not believe</u>, however, <u>that sufficient prejudice had occurred to merit the extreme sanction of a mistrial.</u>  <u>We hold that she did not abuse her discretion in that regard.</u>  <u>A mistrial</u> is not a sanction designed to punish an attorney for an impropriety.  It <u>is rather an extreme sanction that sometimes must be resorted to when such overwhelming prejudice has occurred that no other remedy will suffice to cure the prejudice.</u>

(Emphasis supplied).

In refraining from aborting this trial, Judge Cahill did not abuse his discretion.

**JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.**

- 23 -