*Hayes v. State*, No. 500, September Term, 2019 & *Winston v. State*, No. 556, September Term, 2019 (consolidated). Opinion by Nazarian, J.

**CRIMINAL PROCEDURE – VOIR DIRE**

Under *Kazadi v. State*, 467 Md. 1 (2020), a trial court must, on request, ask during *voir dire* whether any prospective jurors are unwilling or unable to comply with the jury instructions on the long-standing fundamental principles of the presumption of innocence, the State's burden of proof, and the defendant's right not to testify.

**CRIMINAL PROCEDURE – VOIR DIRE – PRESERVATION**

A criminal defendant must preserve for appellate review their request for *voir dire* questions relating to prospective jurors' willingness or ability to comply with the jury instructions on the long-standing fundamental principles of the presumption of innocence, the State's burden of proof, and the defendant's right not to testify.

Circuit Court for Baltimore City
Case Nos. 117354034, 117354033

<u>REPORTED</u>

<u>IN THE COURT OF SPECIAL APPEALS</u>

<u>OF MARYLAND</u>

Nos. 500 & 556
September Term, 2019
_____

CONSOLIDATED CASES

**ON MOTION FOR RECONSIDERATION**
_____

No. 500
TONYA HAYES
v.
STATE OF MARYLAND
_____

No. 556
MARQUESE WINSTON
v.
STATE OF MARYLAND
_____

Nazarian,
Beachley,
Battaglia, Lynne A.
   (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Nazarian, J.
_____

Filed: August 25, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

A popular bartender, Alex Wroblewski, was shot and killed at a Royal Farms store in Locust Point, where he had stopped on his way home after a shift. After a joint trial in the Circuit Court for Baltimore City, a jury found Tonya Hayes guilty of transporting a handgun in a vehicle and conspiracy to transport a handgun in a vehicle and Marquese Winston guilty of second-degree murder, use of a handgun in the commission of a crime of violence, transporting a handgun in a vehicle, conspiracy to transport a handgun in a vehicle, and carrying a handgun on his person. Ms. Hayes and Mr. Winston raise numerous challenges to their convictions. We reverse the convictions and remand both cases for further proceedings consistent with this opinion.

## I.     BACKGROUND

We recount the evidence presented at trial, viewed in the light most favorable to the State, the prevailing party. Surveillance cameras captured the incident, and the jury heard eyewitness testimony alongside the footage.

On November 14, 2017, Lawrence Greene worked the graveyard shift at the Royal Farms. That night, Mr. Wroblewski, who was a regular, came in at around 1:00 a.m., whereas he "normally [came] in between 2:30 and 3:00 in the morning." According to Mr. Greene, Mr. Wroblewski "was toasted when he came in." He remained in the store for about fifteen minutes and ordered food, but as he was leaving, "[h]e was stumbling all over the place." At that point, Mr. Greene saw "a young boy and then a older woman, the woman, heavyset, light skinned" come into Royal Farms. When the two saw Mr. Wroblewski, "the young man got really happy" and "was jumping up and down, skipping." When Mr. Wroblewski left the store, the two followed him. Video surveillance

at Royal Farms confirmed everything to this point.

Mr. Wroblewski's condition and the behavior of the young man and older woman led Mr. Greene to go check on Mr. Wroblewski. As he approached, he heard a "bang" and went "all the way up by [Mr. Wroblewski]," saw that he was "laying on his back," and "checked his pulse and [saw] that he was still living, he was still breathing and everything." Mr. Greene observed that Mr. Wroblewski still had "his food, his bag, his cell phone and [] his wallet . . . beside him." He went back in the store and told another employee to call 911.

Kiara Giddons was the cashier on duty that night. She described Mr. Wroblewski as "wasted" when he arrived. She testified that after he paid for his food, he went towards the window where there was a bar stool, and he sat there for a minute. Ms. Giddons saw "three people—two people getting out the car, [] a lady and a man getting out the car. And the other guy [] just sat in the car. They parked [near] the gas station." Ms. Giddons saw the woman and the man come into the store, and when Mr. Wroblewski left, the pair immediately left as well. Ms. Giddons testified that she walked outside and saw Mr. Wroblewski walking up the street, then she "heard one gunshot." She and Mr. Greene ran to where Mr. Wroblewski was lying, and Ms. Giddons then ran back in the store to call 911.

Lasheka Moore was the manager on duty. She testified that Mr. Wroblewski "was a regular" at the Royal Farms, but that night, "he spent a little bit more time than usual in the deli area" and "[a]ctually laid his head on top of the deli." Ms. Moore "walked over to [Mr. Wroblewski] and was, like, hey, why don't you go ahead and sit down, eat your food,

2

wait for your friends to come[,]" and he replied "that he was okay." She testified that Mr. Wroblewski was in the store for about "10, 15 minutes" and when he left, "he was staggering on his way out the door." She observed that the Black male and the Black female to whom Mr. Greene and Ms. Giddons referred in their testimony seemed "a little off" because "they came and pulled up to the gas pump, but didn't purchase anything." Ms. Moore identified Mr. Winston as the Black man and Ms. Hayes as the Black woman.

Ms. Moore testified further that Mr. Wroblewski left the store and walked "towards the Bank of America ATM machine." Mr. Winston then walked out ahead of Ms. Hayes, but when Ms. Hayes "was exiting the store, she looked in the direction of [Mr. Wroblewski], then looked back at the car." Ms. Moore saw Mr. Winston go to the back seat of the car, where "another male pops up out the car." Mr. Winston walked off a little bit, "and then the male that's in the backseat gets out the car and throws his hood over his head." They both "went walking across the parking lot towards the direction that [Mr. Wroblewski] was going in." Ms. Hayes "jumped in the driver's side, pulled off slow, like as if she was behind them."

Ms. Moore testified that at that point, she "grabbed a broom and [] went outside to sweep the sidewalk, [] made it to about the Bank of America ATM machine, [when she] heard a gunshot." She later identified all individuals involved through a photo array.

Dr. Patricia Aronica was the medical examiner who performed Mr. Wroblewski's autopsy. She testified that Mr. Wroblewski had "an entrance gunshot wound to the abdomen and there were also some additional injuries which were multiple abrasions which are like scrapes and scratches where the top layer of the skin comes off and then some

3

bruising were also noted." She assigned the cause of death as the gunshot wound and the

manner of death as homicide. Dr. Aronica described how the gunshot wound killed him:

> [THE STATE]: And what type of wound would you have considered this as far as—would it have been considered a rapidly fatal wound or not so rapid, how would you describe this wound?
>
> [DR. ARONICA]: Well, this is a fatal wound but because it hit—the bullet hit all these veins, it's a slower bleeding wound then say if it hit arteries. It's going to bleed slower, it's also going to cause intestinal contents to come out into the abdomen so it has great potential for infection, if they were able to stop all of the bleeding, but there was massive amount of blood loss but it would be slower and very difficult because of all the injuries that it did create to the veins.

She opined that there was "no evidence of close range firing" and that "[t]he level of

alcohol had no effect on [Mr. Wroblewski's] death."

Tivontre Gatling-Mouzon,[1] who pled guilty to conspiracy to commit armed robbery

for his involvement in the killing of Mr. Wroblewski, testified on behalf of the State.

Mr. Mouzon is Ms. Hayes's son. He testified that Ms. Hayes picked him and Mr. Winston

up in Richmond, Virginia to drive to Baltimore to pick up his younger sister,

Tiana Witherspoon, who was living there with her father. They stopped that night at

Royal Farms to get gas after picking up Ms. Witherspoon.

Mr. Mouzon testified that Mr. Winston and Ms. Hayes went into the store while he

sat in the car with his sister. While they waited, Mr. Winston came back to the car and

"reached down by [his] leg." Mr. Winston asked Mr. Mouzon "to come with him around

---

[1] Although he has a hyphenated last name, Mr. Mouzon testified that he preferred to be called "Mr. Mouzon."

4

the corner . . . ." Mr. Mouzon followed Mr. Winston and saw him "conversating with the victim, arguing . . . ." He described this encounter as "a confrontation." Then Mr. Winston approached Mr. Wroblewski, and Mr. Mouzon "s[aw] the gun[]" in Mr. Winston's hand. After more confrontation, he began to head back to the car, but before he got in he "heard a shot." By then, Mr. Winston "was already coming to the passenger side to get in." They all left the area and went back to Richmond.

Detective Jonathan Riker was the homicide detective assigned to the case. He testified that he put the Royal Farms surveillance video on social media to try to locate the individuals responsible for killing Mr. Wroblewski. Through social media, Detective Riker was able to identify the woman as Ms. Hayes. He then reached out to Ms. Witherspoon's father, Steven Witherspoon. Mr. Witherspoon identified Mr. Winston as the male in the video and he also was able to identify Mr. Mouzon. Detective Riker located Mr. Mouzon in Richmond. The Detective put Ms. Hayes's vehicle information in the National Crime Information Center database and was able to locate her and Mr. Winston in Atlanta, Georgia; Officer Justin Hartsfield, a police officer in Atlanta, pulled Ms. Hayes over in her vehicle in response to a "Be On The Lookout" ("BOLO") alert identifying her as "armed and dangerous." The Atlanta Police then contacted Detective Riker, who along with Detective Dave Moynihan, flew to Atlanta to interview Ms. Hayes and Mr. Winston. No gun was ever recovered.

Mr. Winston testified in his own defense. He testified that on the evening of November 14, 2017, Ms. Hayes drove up from Atlanta, where she was living, and picked him up to drive to Baltimore to "pick up her daughter." According to Mr. Winston, they

5

did not intend to stay the night in Baltimore and planned to travel immediately back to Richmond after picking up Ms. Witherspoon. He testified that before and while heading to Baltimore, he had been drinking vodka and beer, had used cocaine and marijuana, and was intoxicated.

Mr. Winston testified that after they picked up Ms. Witherspoon, they stopped at Royal Farms. When they approached the store, he saw "Mr. Wroblewski coming out the store, [and] witnessed [Mr. Wroblewski] hock spit in [Ms. Hayes's] direction." This made him feel "disrespected." He said that he did not immediately confront Mr. Wroblewski because he was "under the influence, it didn't sink in right then and there." He was "carrying [his] gun" into the Royal Farms because he did not want "to leave a gun inside of a car with the kids." He left the store to "catch up" with Mr. Wroblewski "[t]o make him aware of his actions and to get an apology." Mr. Winston "confront[ed] [Mr. Wroblewski] and let[] [Mr. Wroblewski] know that he just spit at [Ms. Hayes] and he needed to give . . . an apology." Mr. Winston testified that during the confrontation, Mr. Wroblewski "started to swing with his [right] hand." Mr. Winston then "backed up," "pull[ed] a gun from [his] right hand and fir[ed]" "[o]ne time." After he shot Mr. Wroblewski, he "ran to the car" and "told [Ms. Hayes] to drive."

The jury found Ms. Hayes guilty of transporting a handgun in a vehicle and conspiracy to transport a handgun in a vehicle. The jury acquitted Ms. Hayes of attempted robbery with a dangerous weapon, attempted robbery, conspiracy to use a handgun in the commission of a crime of violence, conspiracy to commit robbery with a dangerous weapon, and conspiracy to commit robbery. The court sentenced her to three years'

6

incarceration for transporting a handgun in a vehicle and three years' incarceration for conspiracy to transport a handgun in a vehicle, all but one year suspended, consecutive to the sentence for transporting a handgun in a vehicle. The court also imposed a probation period of thirty days.

The jury found Mr. Winston guilty of second-degree murder, use of a handgun in the commission of a crime of violence, transporting a handgun in a vehicle, conspiracy to transport a handgun in a vehicle, and carrying a handgun on his person. The court sentenced Mr. Winston to forty years' incarceration, suspending all but thirty, for second-degree murder; ten years' incarceration for use of a handgun in the commission of a crime of violence, consecutive to the sentence for second-degree murder; three years' incarceration for transporting a handgun in a vehicle, concurrent with all other sentences; three years' incarceration for conspiracy to carry a handgun in a vehicle, to run concurrent with all other sentences; and three years' incarceration for carrying a handgun, concurrent with all other sentences.

Ms. Hayes and Mr. Winston filed timely notices of appeal. We consolidated their appeals because they present overlapping issues, arise from the same operative facts, and were tried together in the circuit court. We supply additional facts as needed below.

## II.    DISCUSSION

Ms. Hayes and Mr. Winston raise various issues that we rephrase.[2] *First,* both

---

[2] Ms. Hayes frames the questions presented in her brief as follows:
    1.  Is the evidence sufficient to convict Ms. Hayes?
    2.  Did the trial court err in refusing to instruct on necessity?

Ms. Hayes and Mr. Winston argue that the circuit court abused its discretion in declining to ask *voir dire* questions about the State's burden of proof and the defendant's right not to testify. *Second*, both Ms. Hayes and Mr. Winston raise challenges to certain jury instructions the court gave, or declined to give, before deliberation. *Third,* Mr. Winston lodges a constitutional challenge, asserting that his right to a speedy trial under the Sixth Amendment was violated. *Fourth*, Ms. Hayes challenges the sufficiency of the evidence to support her convictions. *Finally*, Ms. Hayes asserts that she received ineffective assistance of counsel at trial. We reverse the convictions on the ground that the circuit court abused its discretion when it failed to propound the *voir dire* questions regarding the State's burden of proof and the defendant's right not to testify.

## A.     The *Voir Dire* Questions.

During *voir dire*, Mr. Winston's counsel requested that the court ask the potential

---

3. Did the trial court abuse its discretion in failing to ask requested voir dire questions?

4. Did the trial court ask voir dire questions in such a manner that improperly shifted the burden of determining the juror's bias to the juror and was trial counsel ineffective for failing to object?

5. Did the trial court err in giving a flight instruction?

Mr. Winston frames the questions presented in his brief as follows:

1. Did the trial court err by refusing to ask the voir dire questions requested by the defense?

2. Did the trial court err by refusing to instruct the jury on imperfect self-defense?

3. Did the trial court err by denying Appellant's motion to dismiss for lack of a speedy trial?

jurors two questions about the burden of proof and presumption of innocence. The court

denied the request:

> [MR. WINSTON'S COUNSEL]: Yes. The next request would be, as far as defense voir dire would be question number 20, defense's proposed voir dire for Mr. Winston, **"In a criminal case like this one, each side may present arguments about the evidence but only the State has the burden of proof. The defendant need not testify on his own behalf nor present any evidence. Would you hold it against the defendant if he were to exercise his Constitutional right to remain silent and/or his right to not present evidence?"** I would ask that this question be asked, included in the Court's voir dire. I would also point out that during jury selection in this case, the last time there were individuals that answered this question.
>
> THE COURT: Okay. That is covered by the instructions, it is a classic catechizing voir dire question and the case law is again clear that not only is not required but it's disfavored so I'm not going to ask that.
>
> [MR. WINSTON'S COUNSEL]: All right. Just but again note my objection for the record. I would also request defense jury voir dire question number 21, **"You must presume the defendant innocent of the charges now and throughout the trial unless and until after you have heard all of the evidence, the State convinces you of his guilt beyond a reasonable doubt. If you do not consider the defendant innocent now or if you are not sure you will require the State to convince you of his guilt beyond a reasonable doubt, please stand."** I would again ask that this question be read and again indicate that people did answer this question when it was on the proposed voir dire during our last jury selection.
>
> THE COURT: All right. Again, that is a classic catechizing question, believe me, the jurors when they come up for their individual responses will be reminded repeatedly that your client and Ms. Hayes are presumed to be innocent and that the burden rests with the State but I'm not going to ask that question.
>
> [MR. WINSTON'S COUNSEL]: And again, I just note my objection. . . .

(emphasis added). Both Ms. Hayes and Mr. Winston assert that the circuit court was required to ask this question, and that reversal is required in light of the Court of Appeals's recent decision in *Kazadi v. State*, 467 Md. 1 (2020), which reversed *Twining v. State*, 234 Md. 97 (1964). We review "for abuse of discretion a trial court's decision as to whether to ask a *voir dire* question," *Pearson v. State*, 437 Md. 350, 356 (2014), and we agree that the court's decision not to ask the question compels reversal for any defendant who requested it.

### 1. Ms. Hayes preserved this contention for appellate review.

This last point is important, and harder than usual to resolve in this case. Because *Kazadi* was decided in the midst of the briefing, the parties filed supplemental briefs addressing the impact and application of that decision to these defendants. In its supplemental briefs in both cases, the State acknowledged that *Kazadi*, by its own terms, applied to "'any other cases that are pending on direct appeal when th[at] opinion was filed, where the relevant question has been preserved for appellate review'" (*quoting Kazadi*, 467 Md. at 47). The State also conceded that both Mr. Winston and Ms. Hayes are entitled to reversal and a new trial under *Kazadi*. When we read the transcript in preparing our initial opinion, we determined that during the court's review of proposed *voir dire* questions, Mr. Winston's counsel objected to the court's refusal to ask questions 20 and 21, but Ms. Hayes's counsel didn't. And because the preservation requirement identified in *Kazadi* was not met as to Ms. Hayes, we held that she was not entitled to relief under *Kazadi*.

After our initial opinion was released on August 3, 2020, Ms. Hayes moved for

10

reconsideration. Her motion raised two arguments. We can dispose quickly of the second, that the State's concession that Ms. Hayes had preserved the *Kazadi* argument waived any preservation objection. The State's concession of error does not bind us. *Coley v. State*, 215 Md. App. 570, 572 n.2 (2013) (an appellate court is not bound by a party's erroneous concession of error on a legal issue). Under Maryland Rule 8-131, we "will not decide any [] issue unless it plainly appears by the record to have been raised in or decided by the trial court. . . ."

As the ensuing discussion details, it takes a lot of careful parsing of the trial transcript and record to figure out what Ms. Hayes raised during *voir dire* and when. Mr. Winston asked twice for the *Kazadi* questions, and Ms. Hayes never joined those requests, despite joining other objections on other occasions. She argues now that she joined the *Kazadi* requests retroactively, but that doesn't work. She did ultimately ask for the questions herself, but only when she submitted a complete list of requested voir dire questions to the court in writing. As we'll explain, though, that request isn't discernible from the transcript, which reveals only the fact of a list and a direction from the court to file it. It is only after pulling the filing from the record that we can see that Ms. Hayes did include them—perhaps unintentionally, but they're there.

Rule 4-323(c) requires parties to raise objections during *voir dire* and jury selection:

> [I]t is sufficient that a party, at the time the ruling or order is made or sought, makes known to the court the action that the party desires the court to take or the objection to the action of the court. The grounds for objection need not be stated unless these rules expressly provide otherwise or the court so directs. If a party has no opportunity to object to a ruling or order at the time it is made, the absence of an objection at that time does

11

not constitute a waiver of the objection.

If an opportunity to object presents itself and a defendant fails to object to a court's refusal to read a proposed question, the objection is waived. *Brice v. State*, 225 Md. App. 666, 679 (2015). And in cases involving multiple defendants, "each defendant must lodge his own objection in order to preserve it for appellate review and may not rely, for preservation purposes, on the mere fact that a co-defendant objected." *Williams v. State*, 216 Md. App. 235, 254 (2014). A defendant "may expressly join in an objection made by a co-defendant but he must expressly do so." *Id.*

The parties' opening briefs and supplemental briefs—understandably, in light of the State's concession—say almost nothing about when and how Ms. Hayes raised the *Kazadi* issue or joined Mr. Winston's request. Ms. Hayes claimed in her opening brief that her counsel joined Mr. Winston's request for the two *voir dire* questions, but the transcript reveals unequivocally that she didn't join at the time Mr. Winston asked the court to read the questions. We noted in our original opinion that the only citation in Ms. Hayes's brief identified a statement by counsel a day later in which counsel did say at that point in the transcript "I just want to say I want to incorporate the arguments of my co-counsel," but the brief offered no discussion or context, and we found that the statement came after a discussion of *voir dire* question number 10. We also found, on our own, a passing (and uncited) mention (by Mr. Winston's counsel) of questions 20 and 21 shortly after, but no reaction or joining then by Ms. Hayes's counsel either. Even on reconsideration, nobody cites, and we still haven't found, any omnibus statement that both defendants joined each other's objections or any other way to bring Ms. Hayes within Mr. Winston's objection.

12

Ms. Hayes's motion for reconsideration identifies a couple of additional places in the transcript, including the one we had found on our own, and contends that on two occasions during the second and third days of jury selection, she joined Mr. Winston's counsel when he restated and reiterated all of his objections to that point. She also contends, for the first time, that before the close of *voir dire*, her counsel submitted a written set of *voir dire* questions that included the *Kazadi* questions. Her argument requires some fairly high-degree-of-difficulty gymnastics to follow and apply, so we now recount, in full, the *voir dire* in this case, both the portions Ms. Hayes cites and a number that she doesn't.

The initial request for the court to include questions 20 and 21 came, as described above, on the first morning of jury selection. We won't quote it again, but as everyone acknowledges, counsel for Mr. Winston asked the court to include these questions, the court denied the request, and counsel for Ms. Hayes neither joined the objection nor said anything else. Mr. Winston's counsel was the defense side's primary spokesperson on the *voir dire* questions, but not to the exclusion of Ms. Hayes's counsel—the colloquy about questions 20 and 21 appears on pages 16–18 of that morning's transcript, and on three other occasions in the immediately preceding eight pages, Ms. Hayes's counsel specifically joined objections Mr. Winston had made:

> THE COURT: Okay. So I'm inclined to stick with the pattern voir dire and I'm going to keep one and two the way they are.
>
> [COUNSEL FOR MR. WINSTON]: Okay.
>
> THE COURT: But your concerns are noted.
>
> [COUNSEL FOR MR. WINSTON]: Okay. I just note my objection for the record.
>
> [COUNSEL FOR MS. HAYES]: *Your Honor, for purposes of*

13

*the record, I'll join this objection as well.*[3]

\* \* \*

[COUNSEL FOR MR. WINSTON]: For the record, defense counsel would request that these three questions be asked.

THE COURT: [Counsel for Ms. Hayes], I assume you're joining in that?

[COUNSEL FOR MS. HAYES]: *Yes, I am.*[4]

\* \* \*

THE COURT: So how about, "The State alleges that the defendants killed another individual using a firearm. Do you have strong feelings about murder or handguns?" You okay with that?

[COUNSEL FOR MR. WINSTON]: That would be acceptable, thank you, Your Honor.

[COUNSEL FOR MS. HAYES]: *That's acceptable to Ms. Hayes, Your Honor.*[5]

Immediately before the discussion of questions 20 and 21, Mr. Winston raised

objections that Ms. Hayes did not join:

[COUNSEL FOR MR. WINSTON]: Just for the record, Your Honor, I would again and I've already read them into the record, just so the record is clear, we would be asking for our questions to be read as written. I think they--

THE COURT: I'm not trying to be obstreperous, is there any case law that says that any one of these questions are actually required questions?

[COUNSEL FOR MR. WINSTON]: I don't have any case law[.] I would only put using it as just a fairness argument, there were people since we did begin jury selection in this case that did answer that they were involved with victim's rights

---

[3] March 26, 2019 Transcript at 8:11–21 (discussion of proposed revisions to pattern *voir dire* questions 1 and 2) (emphasis added).

[4] *Id.* at 10:19–11:20 (discussion of proposed questions 11, 12, and 13) (emphasis added).

[5] *Id.* at 13:21–14:4 (in response to colloquy regarding the "strong feelings" question) (emphasis added).

14

groups specifically for—specific to this incident.

THE COURT: Okay.

[COUNSEL FOR MR. WINSTON]: Therefore, I think that in this particular case, it is important that those two questions be asked.

THE COURT: Well, again, I will ask the organizational bias question which I think gets to the exact same thing and is just as likely to uncover any basis for a strike for cause.

[COUNSEL FOR MR. WINSTON]: I just would again note my objections for the record that our request is for defense's jury instructions listed number 14 and 15, which have already been read into the record.

THE COURT: Okay. Anything else?

[COUNSEL FOR MR. WINSTON]: Yes. The next request would be, as far as defense voir dire would be question number 20 . . . .[6]

After the court denied Mr. Winston's request to ask questions 20 and 21, Mr. Winston asked the court to ask question 22. Ms. Hayes did not join that request and the court denied it. Then, after colloquy about two mandatory questions, Mr. Winston asked the court to ask pattern question 15, which Ms. Hayes joined and the court granted (it too was mandatory):

> [COUNSEL FOR MR. WINSTON]: We would ask for the pattern instruction 15, defendant's person traits.
>
> THE COURT: Mm-hmm.
>
> [COUNSEL FOR MR. WINSTON]: "The defendant has identified himself as African American."
>
> THE COURT: Okay.
>
> [COUNSEL FOR MR. WINSTON]: "Do you have any strong feelings about the defendant's race."
>
> THE COURT: All right. Again—

---

[6] *Id.* at 15:20-16:25.

[COUNSEL FOR MS. HAYES]: *We will join in that request, Your Honor.*

THE COURT: So I can say the defendants have identified themselves, I can do it that way?

[COUNSEL FOR MS. HAYES]: *Yes.*

THE COURT: Okay. That's fine. All right. That's a mandatory, I have no problem giving that if you want it.

[COUNSEL FOR MS. HAYES]: Thank you.[7]

The parties and the court wrapped up their discussion of the *voir dire* questions, and when asked in so many words if she had anything else to raise, counsel for Ms. Hayes said no:

[COUNSEL FOR MR. WINSTON]: I think I'm just about done, Your Honor.

THE COURT: It's easier to do it like this than having you huddled while the venire comes in so I'm glad we can get to it first thing. All right. [Counsel for Ms. Hayes], anything else?

[COUNSEL FOR MS. HAYES]: *No, Your Honor.*[8]

At that point, the venire entered the room, and the process of jury selection began. Throughout the discussion of the *voir dire* questions, though, Ms. Hayes's counsel was involved and engaged, and appeared to make conscious decisions about when to join Mr. Winston's objections and when not to. We're not blessed with clairvoyance, nor is it our role to determine what motivates trial counsel, but counsel's decisions not to join Mr. Winston's objections *in toto* and to join individual objections selectively doesn't look inadvertent.

Over the rest of that day and the two that followed, questions 20 and 21 came up

---

[7] *Id.* at 20:11-21:3 (emphasis added).
[8] *Id.* at 21:4-10 (emphasis added).

only one other time, on the second day. Rather than jumping ahead to that, though, we need to continue working chronologically to place Ms. Hayes's current argument in context.

Later on the first day of jury selection, in an exchange Ms. Hayes cites in her motion for reconsideration, counsel for Mr. Winston renewed his objections relating to *voir dire* generally. This occurred just as the court and parties were preparing to begin questioning individual jurors and, as Ms. Hayes notes, her counsel did join the renewal:

> THE COURT: I'm sorry, you have a motion?
>
> [COUNSEL FOR MR. WINSTON]: Yes. I wanted to renew my objections to the Court voir dire, I will—ask to incorporate my arguments that have already been made.
>
> THE COURT:  Okay. Objection is noted for the record.
>
> [COUNSEL FOR MR. WINSTON]: Thank you.
>
> [COUNSEL FOR MS. HAYES]: I join the objection.
>
> THE COURT: Okay.
>
> [COUNSEL FOR MR. WINSTON]: Thank you.[9]

Jury selection continued for the rest of the day and resumed the next morning. Right at the beginning of the second day, before Mr. Winston and Ms. Hayes returned to the courtroom, counsel for Mr. Winston renewed his motion as to the phrasing of questions 1 and 2, which the court denied, then moved on to discuss question 10. During the discussion of question 10, and after the court directed the parties to submit copies of their *voir dire* requests in writing for the court file, counsel for Ms. Hayes spoke up to join co-counsel's arguments about questions 1 and 2:

> THE COURT: Wait—[counsel for Ms. Hayes] wants to say something.

---

[9] *Id.* at 361:19-362:4.

[COUNSEL FOR MS. HAYES]: Thank you. *I just want to say that I incorporate the arguments of my co-counsel.* And I just wanted to point out to the Court that I think there were at least a few instances where individual jurors came up and said, you know, now that you have said this, I am now thinking of that incident.

I think the phraseology of those two questions, we need to have the repetition of "Are you familiar with the incident?" We had a couple of people that remembered it later on. I incorporate what co-counsel is requesting and I as that they be—those two questions as they have been phrased and as we as—worked with the original jurors in terms of phrasing the incident and the description of the location, be asked of our original panel coming back on Thursday again.

THE COURT: Okay. Denied.[10]

Ms. Hayes claims in her motion for reconsideration that this exchange included Mr. Winston's request to ask questions 20 and 21. It didn't. Counsel for Mr. Winston only brought up questions 10, 11, 12, 13, 14, 15, 20 and 21 in the exchange that followed. And contrary to the claim in her motion, counsel for Ms. Hayes did not join or say anything when counsel for Mr. Winston reiterated his objections as to those questions, including the questions the court was not asking:

> [COUNSEL FOR MR. WINSTON]: Okay. And just so—and I will not reread the instructions, but I will make sure that a copy of the defense's jury instruction requests (indiscernible 9:29:40 a.m.) admitted into the record. But just to be clear, what I was asking for in lieu of the Court's number 10 is defense under—with Mr. Winston's voir dire, our number 11, 12 and 13.
>
> THE COURT: Okay.
>
> [COUNSEL FOR MR. WINSTON]: Then moving on again, I believe we could—so as far as the charges, I believe the Court

---

[10] March 27, 2019 Transcript at 8:23-9:17 (emphasis added).

18

has made changes to those that are—

THE COURT: Yes.

[COUNSEL FOR MR. WINSTON]: —compliant with—and I would be in agreement on that point. *With the Court's number 16, I have or would again request, which I requested yesterday, which would be defense's—under again, Marquese Winston's voir dire, number 14, 15, 20 and 21.*

And I did—I believe we also addressed this yesterday, there was—when we got—and I believe the Court added this and we'll most—I believe the Court intends to add it again, when we get to the question—

Where's the final question?

Court's indulgence.

THE COURT: Right. The two I added yesterday about defense—defendant's identification—self identification was African-American—

[COUNSEL FOR MR. WINSTON]: Yes.

THE COURT: —and organizational bias, the—I will be reading the pattern voir dire questions on those two topics.

[COUNSEL FOR MR. WINSTON]: Thank you, Your Honor.

And I can go in—as far as—the one where—the question where Your Honor asks whether anyone's been a victim of similar crimes, the Court will be making the addition of all the crimes—

THE COURT: Right.

[COUNSEL FOR MR. WINSTON]: —that it listed yesterday—

THE COURT: Right.

[COUNSEL FOR MR. WINSTON]: —before all three?

THE COURT: We'll be saying, a victim of crimes similar to the crimes charged, which include homicide, robbery, armed robbery, assault, and handgun violence.

[COUNSEL FOR MR. WINSTON]: Thank you. We appreciate that.

*So I would note that all those other objections of the questions I stated that the Court is not asking.*

THE COURT: *Okay.*[11]

After handling some logistics, the court began the second day of *voir dire*. As the lunch recess approached, counsel for Mr. Winston renewed his objections to *voir dire*. At the court's prompting, counsel for Ms. Hayes joined:

> [COUNSEL FOR MR. WINSTON]: Yes, for the record, Your Honor, I would renew all of my objections I made earlier to the Court's voir dire, incorporate all further argument—all the arguments I made earlier.
>
> THE COURT: All right.
>
> And [counsel for Ms. Hayes] joins in your objection?
>
> [COUNSEL FOR MS. HAYES]: I join, yes.
>
> THE COURT: And for the reason stated for the last two days, the objections are noted but overruled.[12]

Questions 20 and 21 were never discussed again, and to that point, Ms. Hayes had not preserved her *Kazadi* claim. Despite objecting or joining objections throughout the discussion of *voir dire* questions, she didn't object or join Mr. Winston's objections either time questions 20 and 21 were discussed specifically. We obviously can't say what motivated these omissions, but counsel was present, engaged, and made objections before and after the court considered these questions. And although the transcripts do reveal two occasions when Ms. Hayes joined Mr. Winston's objections *en masse*, those omnibus joinders happened only *after* counsel failed to object specifically as to questions 20 and 21—indeed, each general joinder follows a failure to join the specific objection. Whether or not they were intended specifically to backfill counsel's earlier decisions not

---

[11] *Id.* at 9:18-11:23 (emphasis added).

[12] *Id.* at 119:9-20.

to ask for the *Kazadi* questions, those joinders cannot relate back to resurrect a request she hadn't made. *Williams*, 216 Md. App. at 254 ("The appellant's eleventh-hour piggybacking on [the co-defendant's] renewal of his earlier objection does not, for the appellant, relate back to that earlier objection.") (*citing* Md. Rule 4-323(a)).

Ultimately, though, Ms. Hayes did raise the issue before *voir dire* ended, if just barely. On the morning of the third day, her counsel passed up to the court a copy of the *voir dire* questions that, she said, encompassed the objections of Mr. Winston's that she had joined:

> [COUNSEL FOR MS. HAYES]: Your Honor, I have a copy of voir dire that encompasses the questions that I joined in Mr. Winston's objections for the specific questions. So I'm just going to submit a copy so we have a written copy of the questions that you're proposing in the court file, if I may please?
>
> THE COURT: Okay.
>
> [COUNSEL FOR MS. HAYES]: I'll approach.
>
> THE COURT: Yes, you can put that in the file.
>
> [COUNSEL FOR MS. HAYES]: Oh, in the file? Okay.[13]

And although she identified this submission for the first time in her motion for reconsideration, she's right that it included the two *Kazadi* questions—it is a cut-and-paste from Mr. Winston, but, intentionally or not, questions 20 and 21 were there.[14] Note that counsel's statement to the court ("Your Honor, I have a copy of voir dire that encompasses

---

[13] March 28, 2019 Transcript at 20:7-18.

[14] The filing begins "NOW COMES the Defendant, Marquese Winston, by and through his attorneys," and names Mr. Winston's counsel. Nevertheless, the caption is the caption for Ms. Hayes's case, the signature block and signature name Ms. Hayes's counsel, and it was submitted in Ms. Hayes's case.

the questions that I joined in Mr. Winston's objections for the specific questions") didn't itself preserve anything beyond what counsel already had preserved to that point. But the written filing did—it's the first, and only time Ms. Hayes herself pressed questions 20 and 21, and, in the context of this case, it's close enough. Although most of the jury selection had been completed at that point, it wasn't yet over. The court had one more day of culling the venire to the final list of candidates, and the court could, had it chosen to, have reconsidered its earlier decision and asked questions 20 and 21 to the distilled panel before the final strikes. Moreover, the undeniably late request didn't sandbag the trial judge. The court made its decision not to ask these questions based on its view of a then-unresolved legal question, and there is no suggestion (or any rational reason we can discern) why its decision would have changed had Ms. Hayes asked it earlier.

This tactical approach does not represent best *voir dire* practice. It would have been a lot clearer had the parties declared on the record that they joined each other's objections or for counsel to have objected the two other times that Mr. Winston objected. The decision not to join Mr. Winston's objections nearly deprived Ms. Hayes of the benefit of *Kazadi*. And it was not, as her motion claims, remotely "plain from this record that this issue was, in fact, preserved by counsel for Ms. Hayes," nor from the citations in the motion papers. To the contrary, as the reader can see, it took more than 4,000 words worth of analysis to reach the conclusion, as we now do, that Ms. Hayes preserved her *Kazadi* claims.[15]

---

[15] Ms. Hayes's reply in support of the motion for reconsideration also takes shots at the State for not defending its earlier concession to her satisfaction in its response brief. Her umbrage is misplaced. Our initial opinion put the State in a challenging position on reconsideration. Although the State could have taken a different position, it seems unfair

22

*2. The circuit court abused its discretion in refusing to ask the requested* voir dire *questions.*

Although decided after the trial in this case, *Kazadi* held that "on request, during *voir dire*, a trial court must ask whether any prospective jurors are unwilling or unable to comply with the jury instructions on the long-standing fundamental principles of the presumption of innocence, the State's burden of proof, and the defendant's right not to testify." *Kazadi*, 467 Md. at 48. Failure to ask the question on request is an abuse of discretion. *Id.* And *Kazadi* applies to "any other cases that are pending on direct appeal when" the opinion was filed. Because they asked for these questions in the circuit court and the court declined to ask them, Mr. Winston and Ms. Hayes get the benefit of *Kazadi*'s holding. *Id.* at 47. We reverse their convictions, remand for further proceedings consistent with this opinion, and address other issues as necessary or to guide those proceedings on remand.[16]

## B. Jury Instruction Challenges.

Both Ms. Hayes and Mr. Winston take issue with certain jury instructions. Ms. Hayes asserts that she was entitled to a defense of necessity instruction. She contends as well that the circuit court should not have instructed the jury on flight. Mr. Winston asserts that he was entitled to an imperfect self-defense instruction. We hold that the circuit

---

to expect the State to do the difficult work of parsing the record to prove preservation that Ms. Hayes hadn't done herself.

[16] We need not, and do not, address Ms. Hayes's claim that her trial counsel was ineffective for failing to object to the court's decision to ask the venire whether any moral, religious, or ethical conviction or belief would prevent them from weighing the evidence and reaching an impartial verdict.

23

court did not abuse in its handling of these jury instructions.

Maryland Rule 4-325 governs jury instructions, and subsection (c) addresses instructions that the parties request:

> (c) The court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding. The court may give its instructions orally or, with the consent of the parties, in writing instead of orally. The court need not grant a requested instruction if the matter is fairly covered by the instructions actually given.

Rule 4-325(c) requires a trial court to give a requested instruction when (1) it "is a correct statement of the law"; (2) it "is applicable under the facts of the case"; and (3) its "content . . . was not fairly covered elsewhere in the jury instruction[s] actually given." *Thompson v. State*, 393 Md. 291, 302 (2006) (*quoting Ware v. State*, 348 Md. 19, 58 (1997)). Unless the trial court has made an error of law, we review its decision to give a jury instruction for abuse of discretion. *Id.* at 311; *Preston v. State*, 444 Md. 67, 82 (2015).

A requested instruction applies to the facts of the case "if the evidence is sufficient to permit a jury to find its factual predicate." *Bazzle v. State*, 426 Md. 541, 550 (2012). And "[t]he threshold determination of whether the evidence is sufficient to generate the desired instruction is a question of law for the judge." *Id.* (*quoting Dishman v. State*, 352 Md. 279, 292–93 (1998)). On review, we determine whether the requesting party produced the minimum amount of evidence necessary to generate the instruction. *Id.*; *Page v. State*, 222 Md. App. 648, 668 (2015). This threshold is low, and the requesting party need only produce "'some evidence' to support the requested instruction." *Page*, 222 Md. App. at 668 (*quoting Bazzle*, 42 Md. at 551)). In reviewing whether "some evidence" existed, we

examine the facts in the light most favorable to the party requesting the instruction. *Id.* at 669 (*citing Hoerauf v. State*, 178 Md. App. 292, 326 (2008)).

> *1. The circuit court did not err in declining to give Ms. Hayes's proposed duress/necessity instruction.*

Ms. Hayes asked the circuit court to include an instruction on the defense of necessity, Maryland Pattern Jury Instruction—Criminal 5:03:

> You have heard evidence that the defendant acted under the influence of an overpowering force. This is called duress. You are required to find the defendant not guilty if all of the following four factors are present:
>
> (1) the defendant actually believed that the duress placed [him] [her] in immediate or impending danger of death or serious bodily harm;
>
> (2) the defendant's belief was reasonable;
>
> (3) the defendant had no reasonable opportunity for escape; and
>
> (4) the defendant committed the crime because of duress.
>
> The defense of duress is not established by proof that the defendant had been threatened with violence at an earlier time. [He] [she] must have been under a present threat at the time of the commission of the crime charged.
>
> In order to convict the defendant, the State must prove that the defendant did not act under duress. This means that you are required to find the defendant not guilty unless the State has persuaded you, beyond a reasonable doubt, that at least one of the four factors of duress was absent.

Ms. Hayes argued that the duress/necessity instruction was generated when Mr. Winston got in the car and told her to move:

> [MS. HAYES'S COUNSEL]: The testimony that we have now I think has generated the possibility that Ms. Hayes had no option but to move the vehicle with the gun in it under fear at that point.

25

THE COURT: Testimony from whom?

[MS. HAYES'S COUNSEL]: Well, if we have testimony from [Mr. Winston] that he gets in the car and then he orders the car to move at that point and he has a gun, that it's reasonable for a jury to find that Ms. Hayes had no choice but to transport the gun at that point. I think it's been generated enough to make an argument to the jury, that's the only reason why she leaves the scene at that point.

THE COURT [TO THE STATE]: [Do] you think that there is a necessity instruction here independent of the perfect and imperfect self-defense instruction?

[THE STATE]: I don't think it's appropriate. In this instance, the victim did not have a weapon. The victim didn't approach the defendant, Winston. Winston approached the victim. The victim was not being aggressive, the victim was walking minding his own business. He did not bring any source of violence to this situation, Winston initiated all of it. And in this instruction, you have to be in immediate fear of death or bodily injury and if you go by [Mr. Mouzon's] statement that Winston came up to the victim with the gun pointed out, then he's the aggressor in this situation.

The court denied Ms. Hayes's request to give the duress/necessity instruction.

Ms. Hayes argues that the circuit court should have instructed the jury on the duress/necessity[17] defense. She asserts that there was "some" evidence supporting those instructions because the facts "establish[ed] that there was no 'reasonable' opportunity for Ms. Hayes to escape as Mr. Winston had just jumped into her car carrying a loaded handgun, she was in 'shock[,]' shaking and crying as her son was yelling for her to pull away from the scene." In response, the State argues that although the evidence showed

---

[17] In *Sigma Reproductive Health Center v. State*, the Court noted that necessity and duress are closely related defenses, so we refer to both and use them interchangeably. 297 Md. 660, 675 (1983) ("When the pressure is from human beings, the defense, if applicable, is called duress rather than necessity.").

Ms. Hayes was upset after Mr. Winston came back to the car, he "made no threats, did not order [Ms.] Hayes to leave the scene, or otherwise put her 'in immediate or impending danger of death or serious bodily harm.'" The State notes further that there was evidence Ms. Hayes "knowingly transport[ed] a firearm before the shooting occurred." As a result, the State asserts, no evidence was generated to support the requested instruction.

Again, not much evidence is needed to support a requested duress instruction:

> The defendant must show "some evidence" and then the burden shifts to the State to show, beyond a reasonable doubt, that the defense does not apply. The "some evidence" standard is that of the common usage of "some," and is well short of the showing required by the "beyond a reasonable doubt," "clear and convincing," or "preponderance" standards. There must be some evidence to support each element of the defense, however. The evidence presented is viewed in the light most favorable to the defendant. The existence of contrary evidence of duress does not foreclose use of the defense. . . . It is of no matter that the claim is overwhelmed by evidence to the contrary. If there is *any evidence* relied on by the defendant which, if believed, would support his claim[,] the defendant has met his burden.

*McMillan v. State*, 428 Md. 333, 355–56 (2012) (cleaned up). But a defendant bears a fairly steep burden to establish duress as a defense:

> [P]resent, imminent, and impending, and of such a nature as to induce well grounded apprehension of death or serious bodily injury if the act is not done. It must be of such a character as to leave no opportunity to the accused to escape. Mere fear or threat by another is not sufficient nor is a threat of violence at some prior time[.]

*Id.* at 354–55. The duress defense applies when a criminal defendant is compelled by duress to commit the crime. *Id.* at 355. Duress is premised on the notion that when a person faces a "choice of evils, the law prefers that he avoid the greater evil by bringing about the lesser

evil." *Sigma Reproductive Health Ctr. v. State*, 297 Md. 660, 676 (1983).

The circuit court concluded correctly that the evidence did not generate a duress/necessity instruction. When reviewing the jury instructions, Ms. Hayes's counsel argued that the instruction was supported by "testimony from [Mr. Winston] that he gets in the car and then he orders the car to move at that point and he has a gun," and it's therefore "reasonable for a jury to find that Ms. Hayes had no choice but to transport the gun at that point." But there was no testimony to support a finding that Ms. Hayes was in imminent danger of serious bodily harm or death if she did not drive the car and transport the gun. Mr. Winston's "order" to move the car did not, by itself, put Ms. Hayes in imminent danger. And although she may have been afraid at the time, "[m]ere fear" is insufficient, and Mr. Winston never threatened her. *See McMillan*, 428 Md. at 355 (*quoting Frasher v. State*, 8 Md. App. 439 (1970)). The circuit court did not abuse its discretion in refusing to instruct the jury on the duress/necessity defense.

> 2. *The circuit court did not err in giving a flight instruction.*

At trial, the circuit court instructed the jury on flight. Before instructing the jury, the court heard argument on whether it should give the flight instruction:

> > [COUNSEL FOR MS. HAYES]: The evidence has been uncontradicted that Ms. Hayes was arrested in Atlanta and that she had a home in Atlanta. That car was registered in Georgia, that it was purchased in Atlanta, that the address of the registration—
> >
> > THE COURT: I know what the evidence said.
> >
> > [COUNSEL FOR MS. HAYES]: So first of all, the question is whether [or] not there's even flight. I think if the Court were to try to say that driving away from the scene of the shooting constitutes flight, then I would reference the case . . . where

> there was some individuals that were on bikes and after the alleged incident happened in that case, they went through the woods. Simply leaving the scene of an incident does not induce flight itself. . . . The evidence is that [Ms. Hayes] went to her home. There is absolutely no evidence that she was aware that they were on the look out for her, that they even put out a BOLO for her. Certainly it was on the news but there's no evidence that she was aware that there was some sort of looking for her, that she somehow concealed herself.
>
> The car itself was found five minutes from her home and the information from the occupants are readily like here she is, and she was arrested without incident[.]

Maryland Pattern Jury Instruction—Criminal 3:24 instructs the jury that although flight cannot establish guilt in itself, the jury may consider flight evidence of guilt:

> A person's flight immediately after the commission of a crime or after being accused of committing a crime is not enough by itself to establish guilt but it is a fact that may be considered by you as evidence of guilt. Flight under these circumstances may be considered by you as evidence of guilt. Flight under these circumstances may be motivated by a variety of factors. Some of which are fully consistent with innocence. You must first decide whether there is evidence of flight. If you decide there is evidence of flight, you then must decide whether this flight shows a consciousness of guilt.

The court gave the pattern jury instruction *verbatim*.

Ms. Hayes argues that the circuit court erred in giving the jury the flight instruction "[b]ecause it is not clear that Ms. Hayes's conduct suggested flight or that the flight suggests a consciousness of guilt[.]" She asserts that her "conduct of driving from the scene of the shooting after Mr. Winston jumped into her car was just as likely motivated by fear after hearing a gunshot in an effort to protect herself and her two children who were also in the car." The State responds that the evidence was sufficient at trial to generate the instruction because "[s]he fled the state by car, and the jury could draw the reasonable

inference that it would be far harder for detectives to find and question her if she were in another state than if she remained nearby[,]" which would also allow the jury to infer that she fled the scene out of a consciousness of guilt.

In *Hallowell v. State*, we defined the circumstances under which a flight instruction is appropriate:

> The Court of Appeals has adopted the four-prong test from *United States v. Myers*, 550 F.2d 1036, 1040 (5th Cir. 1977), in assessing whether a flight instruction is appropriate under the circumstances of a given case. [*Thompson v. State*, 393 Md. 291, 311 (2006) (*citing Thomas v. State*, 372 Md. 342 (2002)).] A flight instruction is permissible only if "the following four inferences" may reasonably be drawn "from the facts of the case as ultimately tried":
>
> (1) "that the behavior of the defendant suggests flight";
>
> (2) "that the flight suggests a consciousness of guilt";
>
> (3) "that the consciousness of guilt is related to the crime charged or a closely related crime"; and
>
> (4) "that the consciousness of guilt of the crime charged suggests actual guilt of the crime charged or a closely related crime." *Id.* at 312.

235 Md. App. 484, 511 (2018).

There is a distinction between "flight" and "departure." *Hoerauf v. State*, 178 Md. App. 292, 323–26 (2008). "[E]vidence of flight is defined by two factors: first, that the defendant has moved from one location to another [*i.e.*, "departure"]; second, some additional proof to suggest that this movement is not simply normal human locomotion." *Id.* at 323. "[A]n accused's departure from the scene of a crime, without any attendant circumstances that reasonably justify an inference that the leaving was done with a consciousness of guilt and pursuant to an effort to avoid apprehension or prosecution based

on that guilt, does not constitute 'flight,' and thus does not warrant the giving of a flight instruction." *Id.* at 325–26. "[T]he classic case of flight is where a defendant leaves the scene shortly after the crime is committed and is running, rather than walking, or *is driving a speeding motor vehicle*." *Id.* at 324 (emphasis added).

This was a "classic case of flight." *See id.* Ms. Hayes (and the others) were on the scene, the shooting occurred, and she drove away in her vehicle. *See id.* Although police had not yet arrived at the scene when Ms. Hayes drove away, the gunshot being fired in a public place undoubtedly would draw their attention. *See Page v. State*, 222 Md. App. 648, 670 (2015) ("[A]lthough the police had not arrived when Appellant began running away, it would be fair to presume that authorities would be arriving to the scene shortly, given the number of gunshots fired in a public place."). A jury could have concluded that Ms. Hayes "departed" the scene and that departure was motivated by fear. The jury could also have concluded, based on the testimony, that Ms. Hayes followed Mr. Winston slowly as he approached Mr. Wroblewski and then fled the scene by driving away after Mr. Winston shot Mr. Wroblewski, and that her flight signified consciousness of guilt for the shooting and its aftermath. We see no abuse of the court's discretion in its decision to give the flight instruction.

> 3. *The circuit court did not err in declining Mr. Winston's request to instruct the jury on imperfect self-defense.*

Mr. Winston's counsel asked the court to instruct the jury on imperfect self-defense. The Jury Instruction, 5:06, provides:

> You have heard evidence that the defendant's actions were based on a mistake of fact. Mistake of fact is a defense. You

31

are required to find the defendant not guilty if:

(1) the defendant actually believed (alleged mistake);

(2) the defendant's belief and actions were reasonable under the circumstances; and

(3) the defendant did not intend to commit the crime [] and the defendant's conduct would not have amounted to the crime [] if the mistaken belief had been correct, meaning that, if the true facts were what the defendant thought them to be, the [defendant's conduct would not have been criminal] [defendant would have the defense of (defense)].

The court then heard argument on whether to give the instruction:

[MR. WINSTON'S COUNSEL]: I would argue that based on the video footage that was shown and explained briefly by [Mr. Mouzon] who testified on the stand, the video in particular shows that the actual incident on Lawrence Street or the shooting, what that video shows and what [Mr. Mouzon] testified to under cross-examination, that that was Mr. Winston backing up from the video, that that was Mr. Wroblewski lunging forward, and that then Mr. Wroblewski falls to the ground.

There is, I guess, [] obviously the inference that the shot happens at that point. Arguably, Your Honor, that is enough for self-defense, that is also enough for imperfect self-defense. All the defense has to do is generate any iota of evidence, not proof beyond a reasonable doubt, not a preponderance, an iota []

\*\*\*

THE COURT: What about the requirement that he not be the aggressor? Didn't he arm himself and follow him down the street?

[MR. WINSTON'S COUNSEL]: The testimony that's come out thus far, there is no one that has seen him arm himself. There is testimony at this point in the trial that he went back to the car.

THE COURT: And then he has a gun in his hand seconds later.

[MR. WINSTON'S COUNSEL]: At some point he has a gun in his hand. There's no testimony that he has the gun in his

32

> hand and the video, the Royal Farm video which shows no gun. The only testimony and evidence is that the gun is at some point out, because again, [Mr. Mouzon] does not see the shooting but he does testify that he gets some glimpse of this weapon. . . .

The court denied Mr. Winston's request for an imperfect self-defense instruction.

Mr. Winston asserts that his "testimony, along with surveillance footage of the incident, provided some evidence that he was not the initial aggressor in his confrontation with [Mr.] Wroblewski" and highlights the fact that "surveillance footage shows [Mr.] Wroblewski spit as he exits the store [while] [Ms.] Hayes can be seen stopping after he does so." The State responds that Mr. Winston was the initial aggressor and "one cannot claim self-defense when one has 'provoked the conflict.'" The State argues further that there was no evidence at trial that Mr. Winston believed he was in danger of death or serious bodily injury from Mr. Wroblewski, and thus that the evidence was insufficient to generate the instruction.

The defendant bears the burden of producing evidence to generate a mitigation or self-defense instruction:

> In Maryland, the defendant has the burden of initially producing "some evidence" on the issue or mitigation or self-defense. Once the issue has been generated by the evidence, the defendant is entitled to a jury instruction explaining the elements of perfect or imperfect self-defense. The Court fleshed out the meaning of "some evidence" [] in which we explained that this standard calls for no more than what it says—"some," as that word is understood in common, everyday usage. . . . It need not rise to the level of "beyond reasonable doubt" or "clear and convincing" or "preponderance." Furthermore, it does not matter if the evidence of self-defense emanates solely from the defendant or is overwhelmed by evidence to the contrary. The defendant's

33

burden is minimal—if there is **any evidence** relied on by the defendant, which, if believed, would support his claim that he acted in self-defense, the defendant has met his burden.

*Porter v. State*, 455 Md. 220, 240 (2017) (cleaned up).

In the same case, the Court of Appeals explained the elements of imperfect self-defense:

> Imperfect self-defense [] does not require the defendant to demonstrate that he had reasonable grounds to believe that he was in imminent danger. Rather, he must only show that he **actually believed** that he was in danger, even if that belief was unreasonable. Additionally, to assert imperfect self-defense, the defendant is not required to show that he used a reasonable amount of force against his attacker—only that he **actually believed** the amount of force used was necessary. Lastly, to have acted in imperfect self-defense, a defendant must have only subjectively believed that retreat was not safe—that belief need not be reasonable. . . . [A] defendant's actual, though unreasonable, belief that he is in imminent danger negates the presence of malice, a prerequisite to a finding of murder. But [] the defendant is nevertheless to blame for the homicide and should not be rewarded for his unreasonable conduct.

*Id.* at 235–36 (cleaned up). An aggressor is not entitled the defense of self-defense, nor, as we have here, an instruction on imperfect self-defense. *See Cunningham v. State*, 58 Md. App. 249, 257 (1984).

The circuit court concluded correctly that there was insufficient evidence to generate a jury instruction of imperfect self-defense. Mr. Winston himself testified that he went to confront Mr. Wroblewski because he felt disrespected when Mr. Wroblewski spit in Ms. Hayes's direction, and, without using those exact words, the circuit court seemed to conclude that Mr. Winston was the initial aggressor (a finding that would preclude this jury instruction by itself). His aggressor status aside, Mr. Winston testified that Mr. Wroblewski

swung at him, but never claimed to feel immediate and imminent danger or that he believed he had to shoot Mr. Wroblewski to protect himself. Instead, in response to the State's question of how he "knew to pull that gun out on [Mr. Wroblewski,]" Mr. Winston responded that he pulled the gun out "[a]s a reflex of when somebody is lunging at [him] and swinging at [him] in self-defense." He testified as well that he "d[idn't] know whether [he] had to pull it out or not, [because he] was intoxicated." Because there was no evidence that Mr. Winston ever had a genuine belief that he was in imminent danger, the circuit court did not abuse its discretion in declining to give the instruction on imperfect self-defense.

### C.      Mr. Winston's Right To A Speedy Trial Was Not Violated.

Mr. Winston asserts that his right to a speedy trial was violated because sixteen months elapsed between his arrest and trial and "[t]he postponements were largely due to the State's delays in turning over discovery and making plea offers, and even the final delay, triggered by the parties' inability to select a jury, was triggered in part by the State only making plea offers to the three codefendants on the very eve of the scheduled trial." He argues that this delay prejudiced him because he was not from Maryland and "experienced heightened shame, fear, and notoriety" due to being "accused of a high-profile crime[.]" The State responds that there were delays due to "a murder trial involving multiple defendants," and although Mr. Winston attributes the delays to the State, "he does not argue that they were done deliberately to hamper the defense." Finally, the State asserts that Mr. Winston failed to allege any "specific allegations of prejudice, i.e. that the delay actually hampered the defense."

35

We recount the chronology as summarized in Mr. Winston's brief:

- He was arrested on November 15, 2017 and indicted on December 20, 2017.

- Defense counsel filed an omnibus motion on January 16, 2018, which included an assertion of his right to a speedy trial. Trial was initially scheduled for May 15, 2018.

- On April 19, 2018, the State requested an advance postponement. At a hearing on April 26, 2018, the State indicated that it had very recently provided discovery to defense counsel, who needed further time to prepare. The Circuit Court postponed the trial until October 3, 2018 and charged the postponement to both sides.

- On September 19, 2018, the State requested another advance postponement. At a hearing on September 24, 2018, the State cited ongoing plea negotiations, which would result in further discovery. [Mr. Winston] objected to the postponement. The Circuit Court postponed the case to February 1, 2019. . . .

- On the night of January 31, 2019, the State conveyed its first plea offers to [Mr. Winston], [Ms.] Hayes, and [Mr.] Mouzon. February 1st was taken up with the defendants considering their plea offers. [Mr.] Mouzon pled guilty, and juror selection was postponed until the ensuing Monday, February 4th. Due in part to media coverage, including coverage of [Mr.] Mouzon's last-minute plea deal, it was impossible to pick a jury by the end of February 5th. A new jury panel was requested. At that point, the administrative judge informed the parties that the trial would be postponed again. She cited unavailability of jurors and the fact that prosecutor assigned to this case was assigned to several others that had been pending "500 and some days plus." [Mr. Winston] objected to the postponement.

- Trial then proceeded on the next scheduled trial date, March 26, 2019. At that point, [Mr. Winston] had been detained for over sixteen months.

Omitted from Mr. Winston's brief, but included in his motion to dismiss, was that jury

selection began on February 4, 2019 but was unfruitful because "[n]umerous venirepersons were struck for cause due to their familiarity with the incident, that weekend's press, and their inability to be fair[,]" and by the end of the next day, there were not enough jurors left to begin peremptory strikes.

We make our own independent constitutional analysis when reviewing the denial of a motion to dismiss for lack of a speedy trial. *Vaise v. State*, 246 Md. App. 188, 216 (2020). "We perform a *de novo* constitutional appraisal in light of the particular facts of the case at hand; in so doing, we accept a lower court's findings of fact unless clearly erroneous." *Glover v. State*, 368 Md. 211, 221 (2002).

When addressing whether a defendant's right to a speedy trial, as prescribed by the Sixth Amendment of the United States Constitution and Article 21 of the Maryland Declaration of Rights, Maryland courts apply the four-factor balancing test from *Barker v. Wingo*, 407 U.S. 514 (1972). Those factors are: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Id.* at 530. None of these factors is "either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant." *State v. Bailey,* 319 Md. 392, 413–14 (1990) *(quoting Barker*, 407 U.S. at 533).

### 1. Length of delay

Before delving into the analysis, we must determine first whether the delay was long enough to trigger the more in-depth constitutional analysis required by *Barker*. *State v. Kanneh*, 403 Md. 678, 687–88 (2008). We measure "the gross period of time between the

arrest and the trial or the hearing on the motion." *Ratchford v. State*, 141 Md. App. 354, 360 (2001). Although "no specific duration of delay constitutes a *per se* delay of constitutional dimension . . . we have employed the proposition that a pre-trial delay greater than one year and fourteen days was 'presumptively prejudicial' on several occasions." *Glover*, 368 Md. at 223. Here, the delay of one year and 131 days between Mr. Winston's arrest (on November 15, 2017) and the first day of trial when the motion to dismiss was made (on March 26, 2019) was long enough to trigger a speedy trial analysis under *Barker*.

Mr. Winston is correct that a delay of more than sixteen months weighs in his favor, but by itself, that factor is not particularly weighty. Instead, "it is a factor to be 'closely correlated to the other factors, such as the reasonableness of the State's explanation for the delay, the likelihood that the delay may cause the defendant to more pronouncedly assert his speedy trial right, and the presumption that a longer delay may cause the defendant greater harm." *Phillips v. State*, 246 Md. App. 40, 58 (2020) (*quoting Glover*, 368 Md. at 225). "The length of the delay . . . appears to be significant principally as it affects the legitimacy of the reasons for delay and the likelihood it had prejudicial effects." *Glover*, 368 Md. at 225 (*quoting Dickey v. Florida*, 398 U.S. 30, 48 n.12 (1970) (Brennan, J., concurring)).

### 2. *Reasons for delay*

"Closely related to length of delay is the State's reason justifying a delay with different weights being assigned different reasons." *Phillips*, 246 Md. App. at 59 (*citing Henry v. State*, 204 Md. App. 509 (2012)). "A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government[,]" but "[a] more

neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the [State] rather than with the defendant." *Kanneh*, 403 Md. at 690 (*quoting Barker*, 407 U.S. at 531).

The trial date was postponed three times, and the trial court found that none of the postponements had the purpose or effect of impeding the defense. The original trial date of May 15, 2018 was postponed until October 3, 2018 because the State had just turned over discovery and defense counsel needed more time to prepare. The trial court found that that postponement cut both ways, that it would have been unusual to try a three-defendant murder case four months after the initial appearance, and that both sides were working diligently to prepare.

The October 3, 2018 trial date was changed to February 1, 2019 because the State was involved in ongoing plea negotiations with the other defendants, which would result in further discovery. During that time period, the trial court found that the delays reflected a lack of diligence on the part of the State, that the proffers related to Ms. Hayes and a dismissed co-defendant and didn't advance Mr. Winston's case and delayed some of the State's responses to discovery. But the court also found that the delays were not egregious and weren't done to impede the defense, and may even have helped Ms. Hayes. The court weighed that postponement somewhat more heavily against the State.

The postponement until the final trial date, March 26, 2019, arose in an unusual way. The parties had begun jury selection, but ran out of prospective jurors after two days because of extensive media coverage of the case. The State's Attorney objected to

postponing, but the administrative judge rescheduled the case because the court did not have enough prospective jurors available for this trial and the others, and because the prosecutor had other trials coming up involving defendants, including murder defendants, whose cases had been pending longer. The trial court weighed this delay "somewhat lightly" against the State, and viewed it (correctly, in our view) as mirroring a delay for a shortage of courtrooms or prosecutors. So although the trial court empathized with these defendants and acknowledged the baseline prejudice to a defendant incarcerated for sixteen months before trial, the court acknowledged that there were no better solutions available.

### 3. Assertion of the right

The defendant bears the responsibility to assert his right to a speedy trial. *Henry*, 204 Md. App. at 554. "Whether and how a defendant asserts his right is closely related to the other factors . . . ." *Barker*, 407 U.S. at 531. For example, "[t]he strength of a defendant's assertion, and not just its occurrence, may 'indicate whether the delay has been lengthy and whether the defendant begins to experience prejudice from that delay.'" *Phillips*, 246 Md. App. at 66 (*quoting Glover*, 368 Md. at 228).

Before he filed his motion to dismiss on March 15, 2019, Mr. Winston had asserted his right to a speedy trial in an omnibus motion filed by his counsel on January 16, 2018. He asserted it again when he objected to the second postponement on September 24, 2018. And he asserted it for a final time when he objected to the last postponement on February 5, 2019. The State does not dispute that Mr. Winston pursued his right to a speedy trial diligently. We weigh this factor in favor of Mr. Winston, but because he cited no specific instances of impairment, we do not weigh it heavily. *See Hallowell v. State*, 235 Md. App.

40

484, 518 (2018).

### 4. Prejudice

The most important factor in the *Barker* analysis is whether Mr. Winston suffered actual prejudice. *Henry*, 204 Md. App. at 554. The speedy trial right advances three interests: "preventing an oppressive pretrial incarceration; minimizing the anxiety and concern of the accused; and limiting the possibility that the defense will be impaired." *Phillips*, 246 Md. App. at 67. The burden to show actual prejudice rests on the defendant, *Henry*, 204 Md. App. at 554, and the failure to do so weighs against the defendant. *See Wilson v. State*, 148 Md. App. 601, 639 (2002) ("accord[ing] great weight to the lack of any significant prejudice resulting from the delay" where the only prejudice was from pre-trial incarceration).

Mr. Winston focuses exclusively on the first two interests: oppressive pretrial incarceration (one year and 131 days) in Maryland, where he was "far away from his family, friends, and community[,]" and the attendant anxiety and concern accompanied by the "heightened shame, fear, and notoriety" because of the infamy of the case, but he asserts no other specific instances of prejudice. But "[o]ppressive pretrial incarceration with its attendant anxiety and concern to the accused is generally afforded only slight weight." *Hallowell*, 235 Md. App. at 518. And the shame, fear, and notoriety stemming from the infamy of the case is not an interest the right to a speedy trial protects. This factor weighs slightly in Mr. Winston's favor.

### 5. Balancing the factors

Although the delay of one year and 131 days between arrest and trial qualifies as a

41

delay of constitutional dimension, delays of this length or greater have frequently been held not to cause a speedy trial violation. *Barker*, 407 U.S. at 533–36 (no speedy trial violation for delay greater than five years); *Phillips*, 246 Md. App. at 57, 68 (no speedy trial violation for delay of approximately four years); *Kanneh*, 403 Md. at 688–89 (no speedy trial violation for delay of thirty-five months); *Hallowell*, 235 Md. App. at 518 (no speedy trial violation for eighteen-month-twenty-two-day delay); *Fields*, 172 Md. App. at 549–50 (no speedy trial violation for twenty-month delay). Our independent review of the *Barker* factors leads us to conclude that (1) the length of delay between arrest and trial was not egregious under the circumstances; (2) the reasons for the delay, although weighing slightly against the State because of failure to manage its heavy case load, were not intended to undermine Mr. Winston's case; (3) Mr. Winston asserted his speedy-trial right diligently; and (4) Mr. Winston failed to identify any specific prejudice other than pre-trial incarceration. This is a complicated multi-defendant murder case that had drawn a great deal of public attention, and the delay in bringing these cases to trial did not violate Mr. Winston's right to a speedy trial.

### D. The Evidence Was Sufficient To Support Ms. Hayes's Convictions.

Although we are reversing her convictions on other grounds, we nevertheless must address Ms. Hayes's contention that the evidence at trial was insufficient to convict her; if it wasn't, the State could not re-try her. *See Ware v. State*, 360 Md. 650, 708-09 (2000). She argues that "the [S]tate produced no direct evidence to suggest that [she] knew Mr. Winston had a gun in her car and thus, she could not be guilty of ***knowingly*** transporting a

42

handgun or conspiring to ***knowingly*** transport a handgun in her car." She asserts that "[o]nly pure speculation supports the jury's convictions." The State responds that the evidence was sufficient because "[a]fter the shooting, [Mr.] Winston returned to the car with the gun and told [Ms.] Hayes to drive away." At that point in time, the State says, she knew that there was a handgun in her car and she drove off anyway.

When reviewing a conviction for sufficiency of the evidence, we ask whether "*any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.*" *Spell v. State*, 239 Md. App. 495, 510 (2018) (*quoting Fuentes v. State*, 454 Md. 296, 307–08 (2017)). "In examining the record, we view the State's evidence, including all reasonable inferences to be drawn therefrom, in the light most favorable to the State." *Id.* It is not our role to retry the case. *Id.* "Because the fact-finder possesses the unique opportunity to view the evidence and to observe first-hand the demeanor and to assess the credibility of witnesses during their live testimony, we do not re-weigh the credibility of witnesses or attempt to resolve any conflicts in the evidence." *Smith v. State*, 415 Md. 174, 185 (2010). "[T]he finder of fact has the 'ability to choose among differing inferences that might possibly be made from a factual situation . . . .'" *Id.* at 183 (*quoting State v. Smith*, 374 Md. 527, 534 (2003)).

Maryland Code (2002, 2012 Repl. Vol., 2019 Supp), § 4-203(a) of the Criminal Law Article ("CL") prohibits a person from wearing, carrying, or transporting "a handgun, whether concealed or open, in a vehicle traveling on a road or parking lot generally used by the public, highway, waterway, or airway of the State." To be convicted of a possessory offense, one must "exercise actual or constructive dominion or control over a thing . . . ."

43

*State v. Gutierrez*, 446 Md. 221, 233 (2016). Knowledge of contraband found in a vehicle, which can be proven through direct or circumstantial evidence, is imputed to the driver of the vehicle. *State v. Smith*, 374 Md. 527, 550 (2003); *see also Samba v. State*, 206 Md. App. 508, 537 (2012) (evidence was sufficient to sustain transporting conviction where the gun was found underneath the driver's seat and within the defendant's reach); *Jefferson v. State*, 194 Md. App. 190, 215–16 (2010) (evidence was sufficient to sustain conviction for transporting a handgun where the gun was recovered underneath the passenger seat in close proximity to the defendant driver and was available for immediate use).

The evidence at trial was sufficient to support Ms. Hayes's conviction for transporting a handgun. Her status as the driver and owner of the car charged her with knowledge that Mr. Winston carried a gun. Even if she hadn't known about his gun initially, Ms. Hayes indisputably knew that Mr. Winston had a gun after the shooting occurred, and with that knowledge she drove Mr. Winston (and his gun) away from Royal Farms and possibly as far as Atlanta. On that record, a reasonable jury could have found Ms. Hayes guilty of transporting a handgun in violation of CL § 4-203(a).

Having found the evidence sufficient for the predicate offense, we ask the same question with regard to conspiracy to commit the offense. To prove criminal conspiracy, the State must prove that two people reached a meeting of the minds to commit a criminal act:

> Criminal conspiracy is a common-law crime that consists of the combination of two or more persons to accomplish some unlawful purpose, or to accomplish a lawful purpose by unlawful means. The essence of a criminal conspiracy is, therefore, an unlawful agreement, which need not be formal or

44

spoken, provided there is a meeting of the minds reflecting a unity of purpose and design. To prove conspiracy, the State may rely on circumstantial evidence, from which a common scheme may be inferred. The State does not have to show an overt act in furtherance of the agreement because the conspiracy is complete when the unlawful agreement is reached.

*Molina v. State*, 244 Md. App. 67, 167–68 (2019) (cleaned up). The defendant "must have a specific intent to commit the offense which is the object of the conspiracy." *Alston v. State*, 414 Md. 92, 114–15 (2010).

The evidence adduced at trial was sufficient to support Ms. Hayes's conviction for conspiracy to transport a handgun. At trial, Mr. Winston testified that after he shot Mr. Wroblewski, he got in Ms. Hayes's car and told her to drive, and she did. Although Ms. Hayes may have been shocked or scared, she still drove after Mr. Winston told her to drive, and a jury could find from this the "meeting of the minds" required for an unlawful agreement. She also committed the overt act in furtherance of that agreement when she drove Mr. Winston and his gun away from Royal Farms. Just as a reasonable jury could have found Ms. Hayes guilty of transporting a handgun, a reasonable jury also could find her guilty of conspiracy to transport a handgun.

**JUDGMENTS REVERSED AND CASES REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. THE MAYOR AND CITY COUNCIL OF BALTIMORE TO PAY THE COSTS.**